## Case No. 14,296.

### TWO HUNDRED AND SIXTY HOGSHEADS OF MOLASSES.

[1 Hask. 24.] [1]

District Court, D. Maine. Oct., 1866.

CHARTER-PARTY—BILL OF LADING—PLACE OF STOWAGE—PARTNERSHIP.

1. A charter-party between the ship-owner and the merchant is the instrument and evidence of the contract for the conveyance of the property.

2. A bill of lading between such parties is but evidence of the shipping of the merchandise in pursuance of the contract, and any terms inserted into it by the charterer, either by accident, or design, that are in conflict with the charter-party will not supersede, or control that contract.

3. A bill of lading, silent as to the place of stowage of cargo, carries with it a presumption that the cargo is to be stowed under deck; but as such silence is not an express contract upon that point, the ship-owner may prove an agreement to carry on deck.

4. A bill of lading, consigning the cargo to a merchant, does not preclude the court from ascertaining the true ownership of the property by other evidence.

5. A partnership may exist in a single shipment, or adventure; and persons owning merchandise in common, who ship it on joint account and risk for sale, are copartners in the adventure.

In admiralty. Libel in rem by the owners of the brig W. H. Parks against her cargo of molasses to recover $1,848.70 freight, for bringing it from Cardenas to Portland under a charter-party, stipulating "for a full cargo of molasses under and on deck." The cargo was delivered on board, and 45 casks of the molasses stowed on deck. The master signed clean bills of lading for the whole cargo without reference to the charter-party, or mention that any of the cargo was stowed on deck. On the voyage, by the perils of the sea, the deck-load was lost. The consignees, Messrs. Churchill, Browns & Manson, made claim to the cargo as their own property, and by answer sought to offset the value of the deck-load, which was lost, against the freight sued

[1] [Reported by Thomas Hawes Haskell, Esq., and here reprinted by permission.]

for. Mr. Manson, one of the consignees being in Cardenas, purchased of one Juan Ferrin in behalf of his firm one half of 1,000 hogsheads of molasses, to be delivered on shipboard at that port at an agreed price to be shipped to Portland on joint account and risk of Ferrin and the consignees. Ferrin chartered the brig in his own name, and prepared bills of lading which consigned the whole cargo to Churchill, Browns & Manson. These bills of lading after being signed by the master, Ferrin forwarded to the consignees with an "invoice of molasses, etc., shipped for account of whom it may concern, consigned to Messrs. Churchill, Browns & Manson." They insured the cargo accordingly, so that the policy did not cover the deck-load. A portion of the molasses shipped on joint account was forwarded by the Lizabel, and Ferrin from time to time drew on the consignees without any appropriation of the drafts to either cargo. The invoices of the two cargoes amounted to $27,359.18 and Ferrin's drafts on account of these invoices accepted by consignees to $19,840.89.

Almon A. Strout and George F. Shepley, for libellants.

Nathan Webb and Thomas Amory Deblois, for claimants.

FOX, District Judge. By the terms of the charter-party in this case, the master was bound to receive on board his vessel a full and complete cargo of molasses in hogsheads, under and on deck, with sufficient small stowage, the captain to sign bills of lading as presented without prejudice to the charter-party. The cargo was put on board by Ferrin, forty-five casks being on deck, and the master signed bills of lading for the full cargo without any exception or statement that any part was on deck, Ferrin being named as consignor, and Churchill, Browns & Manson consignees. The deck-load being totally lost by the perils of the sea, would Ferrin if he were the claimant have the right under the circumstances of the case to offset, or recoup the claim for freight by the value of the deck-load? I apprehend not. Ferrin is the person named in the charter party as charterer of the brig, and if he should be deemed the owner of the cargo, the charter-party is as between him and the ship-owner the instrument and evidence of the contract for the conveyance of the property, and the bill of lading is as between these parties only evidence of the shipping of the particular merchandise to be conveyed in pursuance of the contract. Any terms therefore incorporated by the charterer into the bill of lading, either accidentally or by design, which are in conflict with the terms of the charter-party, could not control the contract as evidenced by the charter-party. Parsons, in his treatise on Maritime Law (volume 1, p. 240), says, "It is usual for the master to sign and give bills of lading in like manner as if there were no charter-party. But nevertheless, they are little more than evidence of

the delivery and receipt and shipping of the merchandise, for the charter-party is the controlling contract as to all the terms and provisions which it expresses."

This charter-party authorized the master to take as a part of the cargo a reasonable deck-load. This was done with the knowledge and consent of Ferrin, and the fact, that the bills of lading which appear to have been made out by one of Ferrin's clerks make no mention of a part being on deck, would not render the ship-owner responsible to Ferrin for the value of the deck-load if lost. Such was not the bargain and intention of the parties; it was on the contrary expressly agreed and understood, that a portion of the cargo should be taken on deck. It was placed there by the consent of Ferrin. No new agreement was ever made respecting it, requiring it to be under deck, and the omission of the fact in the bill of lading will not prevent the ship-owner from falling back on the terms of the charter-party, which it is admitted was the only agreement ever made respecting the way and manner of loading the cargo.

But if there had not been a charter-party, the result would have been the same, if Ferrin were the claimant. The bill of lading it will be observed is in the usual form, and does not in terms state where the cargo is stowed, whether under, or on deck. It is silent as to the place of stowage, and from this silence a presumption arises that the goods are to be stowed under deck, that being the usual and ordinary method of stowage. But if the contract or bill of lading is not express on this point, the ship-owner is then at liberty to rebut this presumption, and prove that the shipper agreed to the stowage of his goods on deck. This question has been examined very carefully by Judge Story in Vernard v. Hudson [Case No. 16,921]. In delivering the opinion of the court the learned judge said, "I take it to be very clear, that where goods are shipped under the common bill of lading, it is presumed that they are shipped to be put under deck as the ordinary mode of stowing cargo. This presumption may be rebutted by showing a positive agreement between the parties that the goods are to be carried on deck, or it may be deduced from other circumstances, such for example as the goods paying the deck-freight only. The admission of proof to this effect is perfectly consistent with the rules of law, for it neither contradicts nor varies anything contained in the bill of lading, but it simply rebuts a presumption arising from the ordinary course of business." A ship-owner, therefore, as against a shipper, would certainly under this authority be at liberty to show what was the agreement in this respect, and there is no dispute in the present case, that the agreement was, that a portion of the cargo should be placed on deck. Ferrin, therefore, could not hold the ship-owner responsible for the deck-load when lost.

The claimants contend that they stand in a very different relation to this cargo, and that they are in no way or manner compromised by the doings of Ferrin. In fact, they claim to be the owners of the cargo by virtue of the bills of lading of the cargo consigned to them by Ferrin, upon the faith of which they have accepted Ferrin's drafts for a large amount, and have procured insurance which did not cover the deck-load. It therefore becomes necessary to determine their true relations to Ferrin and the cargo, and how far they are affected by Ferrin's doings and his consent to a portion being placed on deck.

It appears that Mr. Manson agreed with Ferrin to purchase of him in behalf of the firm one half of a thousand hogsheads of molasses, of which this cargo is a portion, delivered on shipboard in the harbor of Cardenas at a fixed price, and that the same should be forwarded to the claimants at Portland on their joint account and risk. Under this agreement this cargo was laden; and in my opinion the parties became jointly interested in this adventure, and their relations to each other in respect to it were those of copartners. The court is not bound by the goods being consigned to the claimants, but is at liberty to go behind the documents and ascertain the true relations of the parties. The fact, that Ferrin once owned the whole of the cargo, does not vary the relations of the parties from what they would have been, if he had purchased of a planter this cargo upon joint account, and afterwards shipped it in his own name to the claimants, drawing on them in payment therefor. When the cargo was laden and Ferrin's drafts were drawn on the claimants for their proportion of the cost under the above agreement, the claimants became jointly interested in the adventure, with all the conditions of an ordinary partnership affecting it. The freight, with all other expenses and charges, was to be borne by the common and joint interest, and the property, from the moment of its shipment, was at the joint risk for profit or loss. There can be no doubt, that under this agreement between these parties, if this cargo had been lost on the voyage without insurance, the claimants would, notwithstanding the loss, have been accountable to Ferrin for one half of the amount of the invoice, or if it had arrived, and a loss had been sustained in the adventure, it must have been shared alike between the parties. I think all the elements of a partnership are to be found in the agreement and proceedings touching this adventure, and it is common learning, that a partnership may exist in a single shipment or adventure, as well as in the most complicated and extended undertakings.

Pothier tells us, "When two persons contract a partnership between themselves, to sell in common certain goods which belong in common to one of them, and to share the proceeds, it is necessary to examine carefully what is their intention. If the intention is to put the very goods into partnership, the partnership will extend to the same, and if a part of the goods perish before the sale proposed by the parties is made, the loss will be as a common loss; but if the intention is to put into partnership, not the goods themselves, but the price which shall be obtained therefor, the entire loss will fall upon the partner to whom the goods belong." See, also, Story, Partn. §§ 27, 28.

This being a partnership adventure, the cargo was to be transported from Cardenas to Portland at the joint and common charge and risk, and although Ferrin was bound by his contract with the claimants to place the goods on shipboard in the harbor, yet he was not to be at the sole expense of the transportation of the goods from thence to Portland. He was the partner at that end of the route, whose duty it was to contract for the carriage of the property. In the charter-party he contracted in his own name, and by so doing, I apprehend he must be considered as entering into it as agent "for whom it may concern," to use his own language in the invoice, and that it did not concern him alone, but the joint interest to be promoted by the charter-party, and the transportation thereby of the goods to Portland. Some one must contract for this purpose; no one but Ferrin was there in Cardenas authorized to contract, and he did not contract in his own behalf to carry his own goods, or his half of the common property, but in my view, rather acted in behalf of all interested, himself and his copartners at this end of the route, exactly as his copartners here did by procuring insurance, not for themselves, but to cover the property in the invoice for whom it might concern.

Ferrin therefore was a copartner, authorized to enter into such an agreement as he should think best for the transportation of this cargo; he might contract to have all go on deck, or all below deck, as he thought most for the common benefit; and any bargain he should make in respect to it would not only be obligatory upon him, but would also bind his copartners. He was their agent in these matters. Whatever he did, he did for them as well as for himself, and his knowledge and consent to the casks being stowed on deck is theirs, and equally obligatory and binding upon them as though they had personally been present at Cardenas, and assented to the shipment in that manner. By the arrangement in the present case, a portion of the goods being stowed on deck, that portion of the cargo which was below deck was taken at a lower rate than it would otherwise have been. The expense of sailing the ship would be the same to the ship-owner, whether he carried a deck-load or not, and having a full cargo on and under deck, the whole would be taken at a less average rate of freight than it would have been, if the ship-

owner was restricted from carrying any portion on deck. The claimants therefore, got the benefit of the goods below being taken with a deck-load at a less rate of freight than they would have been if no portion had been upon deck, and having thus derived and availed themselves of the advantages and profit of the agreement of their copartner, they must also share in any risks and losses attending it. "Qui sentit commodum sentire debet et onus."

But it is said the claimants, relying on the bill of lading, procured insurance on this cargo, which did not cover that portion which was on deck, and that thereby they have sustained a loss. But for whose benefit was this insurance? Was it for their individual benefit, or was it for the common interest? It should have been, and undoubtedly was for whom it might concern, that is, for Ferrin as well as for themselves, and being so, and Ferrin having knowledge that the goods were on deck, and having agreed to their being there, it is not for him, or his copartners now, to complain of any loss sustained by them by reason of the bill of lading being filled out fraudulently, or negligently, by Ferrin without mention of the deck-load. The same answer may be given to the claim of Churchill, Browns & Manson, on account of their acceptance of the drafts drawn upon them by Ferrin. They were drawn by one partner upon his copartners on account of the partnership business. If Mr. Manson, when in Cardenas, had there purchased on account of his firm a cargo of molasses, and had drawn drafts in payment of the cargo on his copartners in Portland, no one can entertain a doubt, but that the other copartners would have been bound by his acts, and that any agreement on his part, that a portion of the cargo should be shipped on deck, would be as obligatory upon them as on him, although they had no personal knowledge of such an agreement, and I can perceive no legal difference between that case and the present. Each are cases of partnership with all the rights and liabilities properly appertaining thereto.

The case of Berkley v. Watling, 7 Adol. & E. 29, is in some respects very similar to the present. In that case, Watling shipped a parcel of goods in his own name consigned to plaintiff on board a vessel belonging to himself and the other defendants. The goods not being delivered to plaintiff, he commenced an action against the three ship-owners; the defense was, the goods were never shipped on board, and that Watling the consignee knew this fact. The court held that Watling should be considered the plaintiff's agent, and if so, the plaintiff was cognizant through his agent that the goods were not shipped, and· therefore he could not recover, although he held the bill of lading for value. The courts say the plaintiff is here the shipper in effect, and sues as shipper, and the bill of lading made out by his agent is not conclusive upon the other owners. In my opinion the defence

can not prevail, and the libellants are entitled to the full freight. Decree for libellants for freight and interest and costs.