## Case No. 4,540.

The ETHEL.

FIVE HUNDRED AND ELEVEN TONS OF NITRATE OF SODA.

[5 Ben. 154.][1]

District Court, E. D. New York. May, 1871.

---

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

C. Donohue, for consignees.
R. H. Huntley, for the bark.

BENEDICT, District Judge. These are two actions heard together, the second of which is brought by the owners of the British bark Ethel against the cargo of that vessel, to recover upwards of $6,000 of freight, claimed to be due upon a charter party. The other is brought by the consignees of the same cargo against the bark to recover upwards of $20,000, for damages arising from short delivery and deterioration in that cargo.

The charter party in question was executed at Valparaiso on the 22d of February, 1870, by the agents of the ship on the one side, and Hainesworth & Co., of Valparaiso, as charterers, on the other. The bark was not then at Valparaiso, but was on her way to the port of Caldera, laden with a cargo deliverable there. Among other things, the charter party provided that the said vessel, "being tight, staunch, and strong, well and sufficiently manned, stored and victualled, and in every respect fit to perform the voyage shall, with all convenient speed, after discharging her present inward cargo, at the port of Caldera, proceed to the ports of Iquique or Junin, and in all or either of said ports, take in a full and complete cargo of nitrate of soda in bags, bills of lading for which to be signed by the master, weight and quality unknown, all on board to be delivered." When loaded as aforesaid, the bark was to proceed with all convenient speed to the port of New York, and there deliver the cargo, and so end the voyage—

dangers of the sea and navigation, from the signing of the charter party till the conclusion of the said voyage always excepted. In consideration of all which, the charterers agreed to pay for the freight of said vessel, on the true and right delivery of the cargo in New York, "according to the bill of lading and charter party," for each ton forty-five shillings sterling. At the time of the execution of this charter party the ship was provided with a full crew of twelve, all told—two of the seamen, however, being engaged only for the run to Caldera. These two left the ship there, one man deserted, and one man became too sick to be able to work. The vessel procured a single man, and thus provided with a crew of only nine men, all told, left Caldera. Upon arrival at Iquique she was directed to proceed to Junin, there to load according to the charter party. On the 20th of March she arrived at Junin, and commenced taking in cargo, and completed it on the 6th of April.' On the 3d of April two more of her seamen deserted, reducing her crew to seven men, all told. After the loading was completed, the master made efforts to supply the deficiency in his crew, but succeeded in obtaining only one man, and was without a crew sufficient to navigate the vessel safely around Cape Horn. He accordingly proceeded from Junin to Valparaiso, in order to fill up his crew there. This was done, and sailing thence for New York, the vessel met with disastrous storms, compelling the jettison of a portion of the cargo, and a return to Valparaiso for repairs. These completed, she again set sail for New York; but the crew soon after mutinied, and forced the master to return to Valparaiso, where another crew was shipped, and another master put on board, under whose command the vessel proceeded to New York, and there safely arrived and delivered the portions of her cargo not jettisoned.

Upon this state of facts, the owners of the vessel claim to be entitled to recover the amount of freight due for the cargo delivered, and a general average contribution towards the expenses caused by the disasters which ensued after leaving Valparaiso; while, on the other hand, the consignees of the cargo deny any liability for freight or general average, and claim to recover of the vessel all the damages and loss sustained by the cargo after its leaving the port of Junin, upon the ground that the vessel unlawfully deviated from the voyage as provided in the contract, by going to Valparaiso.

In determining the legal liabilities which arise out of the facts which these cases disclose, I remark, first, that the bill of lading, given at Junin under the circumstances proved, amounts to no more than a receipt to indicate the quantity of cargo shipped in pursuance of the charter party, of which the consignees had notice by the provision in the bill of lading, that the freight was to be paid as per charter party. Accordingly the

charter party alone is to be looked to for the contract of the parties. By the charter party the ship owner covenanted that the bark, being well and sufficiently manned, with all convenient speed, after discharging her inward cargo at Caldera, should proceed to Junin, and having there taken in a full cargo, proceed thence with all convenient speed to the port of New York, and there deliver the cargo, and so end the voyage.

This was a contract to proceed from Caldera to Junin, and from Junin direct to New York. Instead of which the vessel went from Junin to Valparaiso, and thence to New York. This was a clear failure to perform the voyage contracted for, as there is no evidence of any usage for vessels bound round the Horn to stop at Valparaiso; and the question is whether it can be held to be excused by the facts in proof. It is not necessary in this case to question the proposition that a deviation may be excused by showing that it was compelled by accident or misfortune, not arising from any fault of the ship owner or his servants. Here the evidence shows that the only circumstance which led to the deviation was the failure to provide, at the outset of the voyage, a sufficient crew to navigate the vessel round the Horn. The facts in respect to the crew are not in dispute. A full crew consisted of twelve, all told, that is, of eight men before the mast, besides the cook; but when the vessel sailed from Caldera she had but five men before the mast. According to the charter party, although the cargo was to be taken in at Junin (or Iquique), the voyage was to commence at Caldera, and at that place and time the covenant for a ship, well manned for the intended voyage, attached. It was, therefore, a manifest violation of the contract to sail from Caldera with such an insufficient crew.

It is true that the charter party was signed in Valparaiso when the vessel was on her way to Caldera, and then the vessel had a full crew. But two of the crew were shipped by the run. It was, therefore, then known that she would have at least two men short at Caldera. The ship owner is chargeable with the knowledge of the facilities for obtaining men at Caldera, which is but a few days' sail by steam from Valparaiso; and the risk of obtaining there a sufficient number of men to constitute a full crew for the voyage was assumed by the ship. If it had been intended to cast that risk upon the charterer, a clause to that effect should have been inserted in the charter party.

Furthermore, the evidence shows that although more seamen were not to be obtained at Caldera when the vessel was ready to sail, they could always be obtained at Valparaiso and sent to Caldera by steamer. It is evident from the testimony that this mode of procuring seamen was well known and entirely feasible at Caldera. Instead of pursuing this course, and thus complying with the provisions of the charter party, as might easily have been done, the master commenced his voyage with a short crew, trusting to the chance of procuring the necessary men at the other ports to be visited before leaving the coast for New York. In so doing a risk was incurred which could not be transferred to the charterer without his consent.

This failure to have on board a full crew at the commencement of the voyage was the sole cause of the deviation, which subsequently became necessary when it was ascertained that seamen could not be procured along the beach to fill up the crew, and being without excuse affords no justification for the deviation. Accordingly, the ship became thenceforth an insurer of the cargo, liable for all damages sustained by it during the subsequent and new voyage.

But it has been contended that the evidence shows that the crew with which the ship sailed from Caldera, although not of the number usually carried by this vessel, was sufficient to navigate the vessel safely around the Horn, and rendered her seaworthy for such a voyage; and that the vessel would have proceeded from Junin to New York direct with that crew, had it not been for the desertion of two men at Junin when the cargo was nearly loaded, and where the master, after due exertion, could only procure a single man. It is claimed, therefore, that in view of this misfortune, the master exercised his best judgment, and rightly concluded that it was for the interest of all concerned, that the ship proceed to Valparaiso for the purpose of making up the deficiency occasioned by the desertion, and that the deviation is thus excused.

To this argument there are two answers, and that without calling in question the correctness of the master's conclusion as to his best course to procure a crew, after the desertion of the men at Junin. First, only two men deserted at Junin, and if the vessel had been well and sufficiently manned when she commenced the voyage at Caldera, the desertion of two men at Junin would not have prevented the completion of the voyage contracted for. Second, desertion of seamen is not a peril of the sea, nor does it afford an excuse to the carrier for a failure to perform his contract. Seamen are servants of the ship owner, necessary to insure the performance of the voyage. It is the duty of the ship owner, at the outset of his voyage, to provide a proper number of them, properly bound to the ship. He must see to it, that his contract with them is kept during the voyage so as to afford no justification for desertion, and he is by law armed with power to prevent unjustifiable desertion as well as to reclaim deserters. When he charters his ship, and covenants to keep her well and sufficiently manned, he assumes the risk of being able, by those means, to retain on board the seamen necessary to sail the ship.

This risk it is entirely competent for him to guard against by a special provision in his contract, when the voyage is such as to make the risk too onerous. But in the absence of such provision, it would hardly do to hold the ship excused from making the voyage, because the sailors ran away. If such were the law, the freighter would be left without protection, for he has no power to select or control the crew. A wide door for fraud would at once be opened, as the ship master could easily so conduct himself as to insure a desertion of the crew at any port where it might be desirable, or could easily afford opportunity for its occurrence with no possible chance of detection by the charterer.

No case has been cited where such an excuse has been held valid, and I know of none. The decision in the case of The Gentleman [Case No. 5,324], to which reference was made, furnishes no authority in support of this defence, and the same remark is applicable to the case of The Eliza [Id. 4,348], which might be referred to as a case somewhat similar to the present in some of its features.

The liability of the ship owner for losses like the present seems clearly established by the French authorities on maritime law. There losses arising from desertion, revolt or insubordination of the crew, are declared not to be losses arising from any peril of the seas, but to be chargeable to the owner. They are classed as arising from barratry of the master—a phrase which, in the French law, has an extended signification, and includes not only crimes and offences, but violations of duty by the master and also by the crew. Code de Com. art. 350, 353; Boulay-Paty, p. 370; Bedarride, Code de Com. lib. 2, tome 4, arts. 1269–1271. The rule thus declared seems to me in harmony with the well settled principles of the maritime law. My conclusion, therefore, is that the circumstances proved in this case do not, according to the maritime law, afford a justification for the failure to make the voyage contracted for, and that the consignees of the cargo are entitled to recover of the bark all the loss and damage to the cargo after the vessel sailed from Junin. They cannot, however, split up their demand for damages, and apply a part of it to offset the ship's demand for the freight, but must suffer a recovery of the freight in the action brought by the owners of the bark. The Water Witch, 1 Black [66 U. S.] 494.

A decree will accordingly be entered in the first named action for the amount of such damages, with an order of reference to ascertain the amount. And in the action of the ship owner a decree will be entered for the amount of the freight, according to the charter party, with a like order of reference.