## THE CHADWICKE.

### BOLCKOW, VAUGHAN & Co., Limited, v. THE CHADWICKE, etc.

(*District Court, S. D. New York.   January 19, 1887.*)

1. CHARTER PARTY—BILL OF LADING—INHARMONIOUS CLAUSES—CONSTRUCTION.
   Where the provisions of a charter party are inharmonious, the general intent, as evidenced by its written portions, and its evident leading purpose, should control the minor provisions. Similar incongruities between the bill of lading and the charter party will also be controlled, as between the ship and the charterer, by the charter-party, as the more deliberate instrument in expressing the intent. Unless there is sufficient evidence of a waiver of the provisions of the charter, or of some new contract, mere loose and inharmonious expressions in the bill of lading, which refer to the charter, will not supersede the latter, as respects matters which the charter was clearly designed to cover.

2. SAME—DELIVERY AT ONE OF SEVERAL PORTS "AS ORDERED ON ARRIVAL"—ALTERNATIVE PORTS—DIFFERENT COLLECTION DISTRICTS.
   On January 11, 1886, at Middlesbro' on Tees, the libelants chartered the C. to take 1,300 tons of iron, and "proceed to the port of New York, Perth Amboy, Hoboken, or Brooklyn, and there to deliver the same *as ordered on arrival.*

Two days after, the cargo was loaded, and a bill of lading signed by the master, stating that the steamer was "bound for New York, and the cargo to be delivered at said port of New York to C. L. P., 30 Pine street, or his assigns; all other conditions as per charter-party." The vessel, on arrival at quarantine, New York, was ordered by the charterer's agents to go to Perth Amboy, a neighboring collection district. The master refused, and this suit was brought for the difference in price on a sale of the iron, for its non-delivery at Perth Amboy. *Held* that, under the circumstances, New York was presumably the primary port at which the order for ultimate delivery, according to the alternative contained in the charter-party, was to be given; that the privilege secured by the charter was a valuable one; that the bill of lading was intended to be but a receipt for the iron and a direction to the primary port only; that the option as to the place of final delivery was not waived, nor intended to be waived, by the bill of lading, and the master was not authorized so to treat it; and that there were no such difficulties, through the naming of different collection districts in the charter, as prevented or excused the ship from delivery at Perth Amboy, as directed at quarantine; and that the ship was therefore liable.

In Admiralty.

*Wilcox, Adams & Macklin,* for libelants.

*Butler, Stillman & Hubbard* and *W. Mynderse,* for claimants.

BROWN, J. The libel in this case was filed to recover damages against the steam-ship Chadwicke, for refusing, on arrival at New York, to go to Perth Amboy to unload, as it is claimed she was bound to do, on request, under a stipulation of the charter.

On the eleventh of January, 1886, at Middlesbro' on Tees, England, the vessel was chartered to the libelants to take on board 1,300 tons of spiegel iron, etc., and, "being so loaded, therewith to proceed to the port of New York, Perth Amboy, Jersey City, Hoboken, or Brooklyn, and there deliver the same *as ordered on arrival.*" The charter, however, provided that the vessel was "to be addressed to the freighter's agent at the port of discharge; the captain to sign bills of lading as presented, without prejudice to this charter." Three days afterward, the cargo being put on board, a bill of lading, in the common printed form, was signed by the master, stating the steamer to be "bound for New York," and that the cargo was to be delivered "at said port of New York, * * * unto C. L. Perkins, Esq., 30 Pine street, or his assigns, * * * and all other conditions as per charter-party;" the port and consignee's name being written in the usual blank spaces.

The steamer arrived at the quarantine station of the port of New York on the fifth of February, 1886, where a telegram from Mr. Perkins to the master dated January 30, 1886, was awaiting his arrival, and was received by the master, directing the steamer to Lehigh Valley Railroad dock, at Perth Amboy. Instead of going thither, he came up the bay, anchored off the Battery, reported to Mr. Perkins, the charterer's agent in New York, demanded to be unloaded there according to the terms of the bill of lading, and refused to go to Perth Amboy. After the charter had been signed, the libelants informed Mr. Perkins, by telegram, of the option contained in the charter. Thereupon the agent obtained an advance of 50 cents a ton upon a contract then pending, in consideration of a delivery of 1,000 tons of the iron at Perth Amboy, instead of "*ex*

ship" at New York. The option was worth to the libelants precisely $500.

The claimants contend that the bill of lading, in making the port of New York the place of delivery, determined the charterer's option; and that he had no right afterwards to direct the vessel elsewhere. Perth Amboy is a different port, and in a different collection district, from New York, although not much further from quarantine, where the master first received his notice, than are the ordinary discharging berths for such cargo in the port of New York. The consular invoices, sworn to by the libelants before the consul at Middlesbro', declared that the cargo was shipped for New York, and designed to be entered there. The Revised Statutes require that manifests shall be prepared at a distance of four leagues from the coast, stating the destination of the cargo, and the intended port of entry, and require the vessel, when ariving within the limits of the port, to make entry there; although there are provisions under which goods destined for different ports, or arriving for orders, may, after arrival at one port, proceed to another port for delivery of the cargo. Sections 2776, 2779, 2807, 2811, 2812. The master in preparing his manifest stated New York as the only port, and entered his vessel at the New York custom house.

The disposition of the cargo was evidently designed to be léft'to the charterer's agent in New York. All the other places of alternative delivery named in the charter are in the immediate vicinity of New York. There is not the slightest reason to suppose that the shipper, in making out the consular invoices and the bill of lading for "the port of New York," actually intended either to waive his option as to the place of final delivery, or to charge himself with any irregularity in a delivery at Perth Amboy, should that be directed by his agent, even if he knew that Perth Amboy was a different collection district from New York, which he probably did not know. The charter-party provides that the cargo is to be delivered at any one of the five places named, "as ordered *on arrival*." The very terms of the charter provide, therefore, for an option to be exercised at the end of the voyage; not at the beginning of it. The designation was to be made on arrival; but on arrival where? Necessarily there must be some place short of the ultimate destination where the orders were to be received, and the master must have understood that fact. But all the other places named are so near to New York, and New York is so naturally the head-quarters for this region, that the master must have understood, when he signed this charter-party, that he was first to go to or near New York, and there await orders as to the particular place of delivery. It is in this sense that the subsequent printed clause in the charter party must be construed, viz.: "The vessel to be addressed to the freighter's agent at the port of discharge." Clearly, this printed clause in the charter cannot be construed as intended to take away the option previously stipulated for in the written clause, nor to override the written clause, making the ultimate place of delivery dependent on directions to be given "on arrival" at the primary port. The words "port of discharge" are not strictly compatible with the prior

clause, and they must yield to the evident intent of the charter as a whole, and be construed accordingly. The charterer's agent was at the port of New York, where, under the circumstances, the master must have expected to go first; and the intent of the whole instrument seems clear that the vessel was to be consigned to New York for further orders,—a familiar form of charter, except that in this case the option was limited to a few places within the immediate vicinity of the primary port.

The bill of lading must be construed in the same sense, and as designed to indicate the port of New York as the primary port only, where C. L. Perkins would direct the place of final delivery according to the option provided for in the charter. No doubt the bill of lading omits what ought to have been inserted in it in order to make its provisions literally harmonious with the charter, and to make the whole intent clear from that paper alone; and some of the ordinary printed language of the bill of lading should also have been stricken out. Such incompatibilities of expression between the charter and the bill of lading are not infrequent, where the charterer's goods are laden on board. Often the two papers wholly fail to be adjusted nicely to each other. A bill of lading referring to a charter-party is never construed as intending to express the whole intent, or to control the charter-party in consequence of mere inharmonious expressions. The charter is the deliberate and controlling document; and, where the intent of the charter is clear, a bill of lading given under it, and referring to it, as between the ship and the charterer, does not supersede the express provisions of the charter-party that are clearly intended to apply to the situation, however inartificially the bill of lading may be framed. It is "little more," says Parsons, (Ship. & Adm. 286,) "than evidence of the delivery and receipt and shipping of the merchandise, for the charter-party is the controlling contract as to all the terms or provisions which it expresses." *Perkins* v. *Hill*, 1 Spr. 123; *Wagstaff* v. *Anderson*, 5 C. P. Div. 171, 177; *Sewell* v. *Burdick*, 10 App. Cas. 74, 105; *Gledstanes* v. *Allen*, 12 C. B. 202; *Rodoconachi* v. *Milburn*, 17 Q. B. Div. 316, 320.

To control the charter-party, there must be sufficient evidence of a new contract between the parties *pro tanto*. In this case there is no evidence of any further or different contract. It is the simple case of a loose, incomplete, and incompatible wording of the bill of lading, but without any further negotiation or change in the consideration or intent of the charter. The bill of lading says: "All other provisions as. per charter-party;" and it thereby adopted all its provisions that were designed by the charter to become applicable. In *Gullischen* v. *Stewart*, 11 Q. B. Div. 186, S. C. 13 Q. B. Div. 317, the bill of lading was held controlling, as to payment of freight and demurrage, because the charterers, in receiving delivery of the goods, acted in the character of *consignees*, and not in that of charterers, which alone the charter-party covered; and the cesser clause of the charter-party was held inapplicable, and not within the original intent.

The stipulation for one of several places as the place of final delivery was a valuable privilege to the shipper, and to some extent burdensome

upon the vessel. It is incredible that the shipper, having secured this option, and carefully provided that it should be exercised "on arrival," and by presumption of law having paid for this privilege, immediately waived it intentionally, and then informed his agent of this option for his future guidance. In my judgment, therefore, the charter clearly controls. The master was not authorized to treat the bill of lading as waiving the option secured by the charter, or as designating anything more than the primary port where he was to receive from the charterer's agent his final orders as to the particular place of delivery. The manifest should have stated the provision for final orders at New York, or the several alternative places, according to the charter. There would then have been no difficulty in delivering at Perth Amboy; and, even after the vessel had been entered at New York, though there would have been doubtless some inconvenience and delay, I think there was no insuperable obstacle. Wyncoop, Vessels & Voy. § 341. No objections of that kind were stated by the master at the time. The complaint made of ice around Perth Amboy seems much more likely to have been the determining consideration, in connection with the inharmonious reading of the written documents, in leading the captain to refuse to proceed thither. There is no evidence, however, that the ice was such as to furnish a legal defense, and no such defense is made.

Decree for the libelants, with costs.