### WEST HARTLEPOOL STEAM NAV. CO., Limited, v. VOGEMANN.

(District Court, S. D. New York. January 26, 1905.)

SHIPPING—DEAD FREIGHT—RIGHT OF RECOVERY UNDER CHARTER.

Where the charter party required a charterer of a steamer to load her to full capacity or pay dead freight, and provided that all matters of such character should be settled on clearance, and on the statement of the first officer, made after examination, that she was loaded to her marks, the captain signed bills of lading for the cargo and delivered them to the charterer, who permitted her to sail on his own time, and although he had sufficient remaining cargo to supply any deficiency, the vessel cannot recover for dead freight on a subsequent claim that she was not fully loaded.

In Admiralty. Suit against charterer for dead freight.

Guthrie, Cravath & Henderson, for libellant.
Wheeler, Cortis & Haight, for respondent.

ADAMS, District Judge. This action was brought by the West Hartlepool Steam Navigation Company, Limited, to recover from Henry Vogemann certain dead freight, based upon an alleged non-compliance with a charter party of the steamer Kirkstall dated January 10, 1903, which was loaded in New York the latter part of January, 1903. The question presented for determination is, whether the vessel was fully loaded or not under the charter party, which provided:

"* * *—Charterers agreeing to load vessel to full draft allowed by Underwriters' Surveyor or Lloyds certificate—failing which dead freight is to

be paid for the number of tons short shipped as shown by the excess buoyancy, payable on right and sure delivery of the Cargo as per Bills of Lading in cash without credit or discount, at current short exchange on London."

The charter also provided:

"2. The whole of said steamer, including alleyways, covered over spaces on deck, peaks, cross bunkers, bridge deck bunkers, if any, deck room, consistent with seaworthiness of the vessel, and all spaces where cargo has been carried before (with the exception only of the captain's and officers' cabins, engine and boiler house, engine room, sufficient coal space for the voyage, the necessary room for the accommodation of the crew) shall be for the sole use and at the disposal of Charterers for cargo, and no other coal, goods or cargo shall be taken on board unless by the written permission of Charterers. All wooden bulkheads to be taken down and carried on deck if required by charterers.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   .

"7. The Master or person appointed by him, shall sign Bills of Lading as presented without prejudice to this Charter, and the freight as per Bills of Lading to be accepted in liquidation of the amount due under this Charter: any difference between Chartered and Bills of Lading freight being settled on clearance—if in Charterers' favor, by Captain's draft payable three days after arrival at Port of Discharge; if in Steamer's favor, in cash less cost of insurance. Charterer's liability to cease on cargo being shipped and difference of freight and or demurrage, if any, paid, Steamer having a lien on the cargo for freight."

The steamer began loading at the Central Railroad's pier 6 or 7, Manhattan, the 19th of January, and finished the 25th about 9 o'clock P. M., at the elevator slip in Erie Basin, Brooklyn. She sailed the next morning. On the evening of the 25th two of the respondent's representatives went to the steamer for the purpose of having the bills of lading signed and adjusting any question of dead freight. They received definite instructions that if any question of dead freight was left open the steamer should not sail that evening. These instructions were given because the captain of the steamer claimed she would take about 150 tons more than her marks would entitle her to. Under the provisions of the charter party and the rules of the New York Produce Exchange, referred to in the charter party, the charterer had until the following afternoon for the purpose of clearance and the steamer could have been held till then without expense to the charterer.

The chief officer of the steamer was sent by the captain with one of the respondent's representatives to ascertain the draft of the steamer. He reported to the captain that she was down to her marks and the bills of lading were then signed by the master. Nothing was said at the time about a full cargo not having been furnished by the respondent. About 9 o'clock the next morning word was received by the respondent from the captain through the dock people, that the ship was 2 or 2½ inches off her marks. The steamer had already started for sea when the word was received. It is testified that she had considerable space for cargo upon her decks at the time of the examination of the draft and that the respondent had a sufficient quantity of cargo then ready for shipment to supply any deficiency but did not attempt to ship it because of the admission that she was loaded to her marks and it was actually shut out.

The libellant contends it should succeed because of certificates granted by underwriters' surveyors but it appears that, in all probability, the

134 F.—64

surveyors had no personal knowledge of the matter, while the chief officer's report was based upon an actual inspection of the steamer's marks just before sailing. The chief officer's statement was accepted by the master and relied upon by the respondent's agents. This in connection with the provision of the charter party that any difference between chartered and bills of lading freight should be settled on clearance, seems to determine the controversy in the respondent's favor. If the captain had claimed he was short of cargo when the bills of lading were signed, the matter could have been adjusted the next day while the steamer remained in port on the ship's time without expense to the charterer. The original dispute with respect to the ship's capacity was apparently amicably adjusted when the bills of lading were signed and the steamer permitted to go to sea upon the charterer's time and it would be unjust to permit a recovery now even if the facts warranted it, which they seemingly do not, the claim being based upon the underwriters' certificates, which are of doubtful correctness.

Libel dismissed.