## THE DROTTNING SOPHIA.

### REDERIAKTIEBOLAGET NORDSTJERNAN v. GANS et al.

(District Court, S. D. New York. April 29, 1907.)

SHIPPING—CHARTER PARTY—DEAD FREIGHT.

> Where a provision is made in a charter party that it shall be superseded by the bills of lading, and an adjustment is made between the charterers and the master before the sailing of the vessel and bills of lading are signed showing that no dead freight is due, it cannot be afterwards recovered by the owner from the charterers.

In Admiralty.

Convers & Kirlin and Charles R. Hickox, for libellant.
Wheeler, Cortis & Haight, for respondents.

ADAMS, District Judge. This action was brought by the Rederiaktiebolaget Nordstjernan, a Swedish corporation, owner of the steamship Drottning Sophia, to recover from John H. Gans and Henry Wehner, doing business as H. Vogemann, charterers of the said steamer, certain dead freight claimed to be due under contract dated October 11, 1905, amounting to $1165.28. The charter provided that the vessel should be furnished with a full and complete cargo of heavy grain, with the option on the charterers' part of loading other merchandise in lieu of a like quantity. of grain, the total freight to be equal to what it would amount to under a full cargo of heavy grain. The defense is based upon certain provisions of the charter as follows:

> "Captain to call at Broker's office, as requested, and sign Bills of Lading, as presented, without prejudice to this Charter Party, and deficiency to be paid at Port of Loading in cash, less insurance, and any surplus over and above estimated freight to be settled there before the Vessel clears at the Custom House, by Captain's draft in Charterers' favor, upon Consignee, payable five days after arrival at Port of Discharge. * * *

> It is also mutually agreed that this contract shall be completed and be superseded by the signing of Bills of Lading on the same form as in use by regular line steamers from loading port to port of destination; or, if port of destination be one to which there is no regular line of steamers from loading port, this contract shall be superseded by the signing of Bills of Lading in the form customary for such voyages for grain cargoes, which Bills of Lading shall however contain a clause for providing for discharging as fast as vessel can deliver during ordinary working hours, any custom of the port to the contrary notwithstanding. * * *

> Charterers' liability under this Charter to cease on cargo being shipped, but the Vessel to have a lien thereon for all freight, dead freight, demurrage or average."

The testimony shows that the steamer's loading was completed at Norfolk, Virginia, on the 18th of November, 1905, when she was loaded down to her marks. The master testified that he contended with the

charterers' representative that he was entitled to dead freight but that is denied and is not credible in view of the opposing testimony, fortified as it is by the provision in the bill of lading quoted below. She was laden with grain in the holds and logs on deck. When it appeared that the grain to be taken in the holds would, in connection with the logs already on deck, fully load the vessel, the underwriter's surveyor stopped the further loading of logs, of which the charterers had an ample supply ready for shipment, and ordered her to the elevator for the grain. She then had space for more cargo on deck which it would have been profitable for the charterers to ship from their supply on hand but they were not permitted to load more as the steamer would be down to her marks, even taking into consideration the additional buoyancy of deep sea water.

When the vessel was ready to sail, she issued a bill of lading to the respondents, containing the following clause in the margin which was signed by the master, apart from his signature to the document:

"Freight and all other conditions as per Charter Party.

No dead-freight due steamer, payable before delivery of cargo at port of discharge. Seven days have been used for loading cargo and all conditions of the Charter Party have been fulfilled at this port."

The master added to the bill of lading at the bottom: "Loaded mixed not responsible for separating." The master also signed a statement, dated November 18, 1905, showing a balance of freight due the charterers of £1822.1.5 and a draft of the same date on the owner in favor of the charterers for that sum. The bill of lading was also dated the same date.

In his testimony, the master claims that he could not effectually protest because it was late at night when he signed the bill of lading and no lawyer was available to prepare the document but to assert that professional assistance was necessary for such a purpose is almost absurd, especially in view of the fact that he made a note on the document, quoted above, to preserve the owner's rights with respect to the loading, which seems to have been done in his own handwriting.

It appears to be clear that the master and the charterers believed that the vessel was fully loaded, although at other times she may have carried more cargo. The master testified that just prior to departure he was obliged to fill one of the water ballast tanks and his statement in this respect is supported by that of the engineer. The respondents on the other hand claim that the tank was full all the time, through some neglect on the vessel's part. This, however, is not supported by testimony. In any event the charterers evidently considered that a full cargo had been furnished and the documents supported them in this view.

The libellant urges that the cargo furnished occupied all the cargo space in the vessel but probably did not weigh as much as the charterers anticipated and that there was really a deficiency of cargo and hence the libellant was entitled to dead freight and on the general question of the charter being a controlling instrument where it differs from a bill of lading, cites The Chadwicke (D. C.) 29 Fed. 521. Such case expresses the general law but is not applicable here because, on the point

in question, there is no conflict, the charter party having provided that it should be superseded by the bills of lading.. This case is governed by its own facts and I have no doubt the master was authorized to adjust the question of dead freight and it did so prior to departure adversely to the libellant's contention here. It is somewhat similar to Barber v. Vlasto (D. C.) 104 Fed. 101, and the West Hartlepool Steam Nav. Co., Ltd., v. Vogemann (D. C.) 134 Fed. 1008, where the recovery of dead freight was not allowed.

The libel will be dismissed.