## TOYO KISEN KAISHA v. W. R. GRACE & CO.

No. 6514.

Circuit Court of Appeals, Ninth Circuit.

Nov. 30, 1931.

Knight, Boland & Christin, of San Francisco, Cal., for appellant.

Orrick, Palmer & Dahlquist, of San Francisco, Cal. (R. W. Palmer, George Herrington, and W. J. Kenney, all of San Francisco, Cal., of counsel), for appellee.

Before WILBUR and SAWTELLE, Circuit Judges, and JAMES, District Judge.

SAWTELLE, Circuit Judge.

On January 14, 1921, the appellee, at its San Francisco office, engaged space with appellant's office, also at San Francisco, for a shipment of nitrate of soda "from nitrate port to Honolulu," on appellant's steamer, Tokuyo Maru. Space and freight charges were arranged for by means of the following letter, which was confirmed by the appellant:

"Referring to our telephone conversations during the past few days, we wish to confirm freight engagement with you as follows:

"2500 Long tons Nitrate of Soda March shipment per 'Tokuyo Maru' from Nitrate Port to Honolulu at $7.00 per ton of 2240 lbs., gross weight delivered.

"Freight payable in San Francisco on receipt of weights from Honolulu.

"This cargo to be loaded according to custom of port in Chile and to be discharged at rate of 400 tons per day, 2000 tons to be discharged at railroad wharf, Honolulu, and 500 tons at Inter-Island Steam Navigation Co.'s wharf, which is adjacent to the railroad wharf and only necessitates the pulling ahead of the vessel.

"One-half (½) cost of weighing to be borne by the consignee at Honolulu and one-half (½) to be paid by vessel.

"All on board to be delivered.

"Kindly confirm on copy of this letter attached herewith.

"Yours very truly,

"W. R. Grace & Co.,

"[Signed]    F. Doelker, Traffic Department."

On the same day appellee's San Francisco office sent a letter to its shipping agent in Chile, Nitrate Agencies, Limited, notifying the latter that arrangements had been made for the shipment in question "at a rate of freight of $7.00 per 2240 lb. gross weight delivered, from Nitrate Port to Honolulu, freight payable at San Francisco * * * on receipt of weight from Honolulu."

The letter ended with the following instruction: "In making up Bs/L we would ask you to kindly omit freight therefrom, and just let the same carry the clause 'freight as agreed.'"

Three days later, a similar letter, referring to another shipment covered by the same freight engagement of January 14, 1921, was sent by the appellee to its shipping agent in Chile.

On March 15, 1921, and on March 17, 1921, respectively, the cargo in question was received by appellant at the Chilean ports of Antofagasta and Iquique. Signed by the master of the ship and by appellee's agent, bills of lading were issued by the vessel, said bills providing that the freight for the cargo was "to be paid, as per margin in DESTINA-TION." (Capitalization according to the record.) One bill of lading reads in the margin "freight as per agreement" and the other "freight as agreed."

Each bill of lading, in printed letters, provided that "said freight [is] to be considered as earned, lost or not lost," and that "all liability for loss or damage to goods shall be determined by their invoice cost plus freight."

The steamship Tokuyo Maru proceeded northward on her voyage from Chile, touching at San Francisco and Portland, and was, with her cargo, subsequently lost by fire at sea.

The steamship company, which was the libelant in the court below, sued for the amount of the freight on the cargo. The lower court dismissed the libel, and the steamship company appealed.

The sole question presented herein is whether or not the oral agreement, the confirmation by letter, and the marginal notations in the bills of lading, operated to defeat the libelant's claim to having earned the freight, "lost or not lost"; or whether, on the other hand, the printed clause as to earned freight, appearing in the bills of lading, as noted above, gave the appellant the right to collect the freight, even though the cargo was lost. The appellee insists that the intention of the parties, by the stipulation that freight was payable in San Francisco on receipt of weights from Honolulu, was clearly expressed that the freight was not earned until the delivery of the cargo at Honolulu; and, in view of the destruction of ship and cargo at sea, not earned at all.

The lower court, in its findings of fact, held that the clause "earned, lost or not lost," is not binding upon respondent-appellee; and that the oral agreement and the letter confirming it "constitute the contract of affreightment between the parties." As a conclusion of law, the lower court found "that the bills of lading were merely receipts for the cargo, given subsequently to the making of the special contract of affreightment, and constitute no part of the contract of affreightment."

The appellant, in its brief, concedes "that stipulations stamped on the face of a bill of lading before its delivery to the shipper re-

ferring to an earlier document incorporates the subject matter to which it refers as a part of the contract," and urges that "it is manifestly the court's duty to reconcile, if possible, the bills of lading with the earlier letter providing for the shipment in question regarding the time when and the place where the freight was to be paid."

While, as we shall see, there is authority for the trial court's holding that the bills of lading, under the circumstances, were merely receipts, it is not necessary thus to limit them in order to hold that, even if it is conceded that the bills of lading "supplement" the earlier contract, they cannot contradict or nullify it.

In its opening brief, appellant complains that "it would certainly be an anomaly if freight was deemed earned but, without the carrier's fault, be not collectible." The answer to this objection, of course, is obvious; the "anomaly" complained of disappears if one follows the directions on the bills of lading themselves, and looks to the prior agreement to ascertain what the parties contracted for in the matter of freight arrangements. That earlier agreement of January 14, 1921, is perfectly self-consistent, and does no violence to the bills of lading, provided we excluded from those bills, as is implied by their marginal directions, questions of freight.

■ Should there exist, however, an irreconcilable repugnancy between the prior written contract and the bills of lading, that conflict would have to be resolved in favor of the former.

On the threshold of our inquiry, we find that the provision for paying the freight after the goods were delivered, contained in the prior agreement, accords with the dictates of good conscience, with the doctrines of general law, and, according to one of appellant's own witnesses, "the usual and customary method of shipping nitrate cargo."

■ Leading text-writers on admiralty law and Supreme Court decisions agree that, in general, where the bill of lading is silent, the contract of affreightment carries with it the carrier's duty to deliver the cargo "safely," and that freight is collectible only on delivery of the merchandise to the consignee.

"Freight," according to Pitman's Encyclopedia of Marine Law (2d Ed.) p. 151, "signified, a sum of money to be paid by the freighter to the shipowner for the safe carriage of goods, wares and merchandise in a ship or vessel."

In Poor on Charter Parties and Ocean Bills of Lading we find the following, in section 28: "By the law, both of the United States and of England, in the absence of some stipulation to the contrary, the goods must be carried to destination before any freight is earned. It makes no difference that the shipowner is prevented by some obstacle beyond his control."

So also Scrutton on Charter Parties and Bills of Lading: " 'Freight,' in the ordinary mercantile sense, is the reward payable to the carrier for the carriage and arrival of the goods in a merchantable condition, ready to be delivered to the merchant. The true test of the right of freight is the question whether the service in respect of which the freight was contracted to be paid has been substantially performed * * *" Article 136 (12th Ed.). See, also, Carver on Carriage of Goods by Sea (6th Ed.) § 543; Merriam, Claims Between Shippers and Carriers, § 881.

In Pollard v. Vinton, 105 U. S. 7, 8, 26 L. Ed. 998, the Supreme Court said of a bill of lading: "It is a contract to carry safely and deliver."

That case is cited with approval in Missouri Pacific R. Co. v. McFadden, 154 U. S. 155, 162, 14 S. Ct. 990, 38 L. Ed. 944, and in Louisville & Nashville R. Co. v. Central Iron & Coal Co., 265 U. S. 59, 67 note, 44 S. Ct. 441, 68 L. Ed. 900. See, also, The Gracie D. Chambers (C. C. A. 2) 253 F. 182, 183, affirmed 248 U. S. 387, 39 S. Ct. 149, 63 L. Ed. 318.

We have dealt at some length upon the principles of general law applicable to this case, for the reason that a consideration of such principles leads us to the conclusion that, a priori, there is no valid ground for not giving full effect to the provisions of the prior oral and written agreements as to freight payment.

Appellant's interpretation of this prior written agreement is not consistent. In some portions of its brief it asserts that the letter of January 14 "was not such a complete contract. It required to be supplemented by the bills of lading"; "the bills of lading taken together with this earlier space engagement contained in the letter of January 14 constitute the contract of carriage"; "we concede that stipulations stamped on the face of a bill of lading before its delivery to the shipper referring to an earlier document incorporate the subject matter to which it refers as part of the contract"; "reading, then, all

these documents together and reconciling them as far as possible," etc.; but, on the contrary, we find the following language on another page of the brief: "(8) That the space engagement was silent as to the ports where the 'Tokuyo Maru' was to receive its cargo, as well as to many other details, for which reason it is apparent that this silence is to be construed as evidence of the intention of the parties to make a new contract, i. e., by the bills of lading."

In other words, at times the appellant asserts that the bills of lading were merely "a supplementary contract," and at another time it contends that it was a new, and, we assume, superseding contract.

In another respect, too, the appellant's argument is not consistent. In one portion of its brief it maintains that " 'the custom of the trade' [is] entirely irrelevant since the parties had made a definite agreement." Yet elsewhere the appellant seeks to answer the argument that freight was payable only "on receipt of weights from Honolulu," and that, "as the weights were never received, the failure of such receipt defeats the carrier's right to its freight," by resorting to custom: "For the purpose of determining the outturn weights we have the custom to which we have referred, pleaded by appellee and admitted by appellant, of subtracting ¾ of 1% from bill of lading weights to determine the weight at port of destination."

Indeed, the appellant itself admits that "there is no question but that the rate of freight had been agreed between the parties prior to the delivery of the cargo to appellant's vessel." Yet, pursuing this argument to its logical conclusion, if the intention of the parties was indeed to make a "new contract" by signing bills of lading, at what rate can the appellant claim to recover for freight, the bills of lading being silent as to such freight rate? It is clear that the bills of lading were not a "new contract," entirely replacing the prior agreement.

As a matter of fact, the appellant seems to be anxiously running from letter to bills of lading to custom in an effort to bolster up its claims; whereas the letter of January 14, 1921, constitutes the complete contract of affreightment, so far as freight rates and their payment are concerned.

We believe that these very inconsistencies in the appellant's argument betray its essential weakness.

As we have already indicated, any contradiction between the letter and the bills of lading must be resolved in favor of the former, unless it is clear that the parties did, as a matter of fact, intend the bills of lading to constitute a new contract, entirely superseding the earlier oral and written agreements. Despite the statement as to a "new contract," quoted above, we do not believe that the appellant contends that the bills of lading entirely supersede the earlier letter. The final position of the appellant seems to be that the bills of lading supersede the letter only in that portion of the letter which relates to collecting the freight.

If the appellee's contention is correct, and the letter should be looked to alone for time of payment, appellant can never collect the freight. If the appellant's view is sustained, it can collect its freight after a reasonable time "after the vessel should have arrived [but did not] at Honolulu." In this respect, as we have seen, the appellant has recourse to "custom," in the face of the plain stipulations of the letter, and in the face of appellant's own objection that "custom can only supplement a contract that is silent in some material respect for which the law does not provide."

The Supreme Court has held that a prior agreement as to freight, even though made by parol, can be proved in the face of a bill of lading. In Mobile & Montgomery R. Co. v. Jurey use of Factors' & T. Ins. Co., 111 U. S. 584, 591, 4 S. Ct. 566, 569, 28 L. Ed. 527, the court said: "It is plain, upon this statement of the controversy, that evidence of the parol contract was perfectly competent, and it was a question to be decided by the jury whether the understanding, as detailed by the witnesses, or the bill of lading expressed the agreement of the parties."

In The Energia (C. C. A. 2) 66 F. 604, 607, the court used the following language:

"The case of The Montana [129 U. S. 397, 9 S. Ct. 469, 32 L. Ed. 788], however, expressly reserves for future decision cases where the contract itself expressly provides that any question arising under it should be governed by the law of some specified foreign country; and appellant seeks to bring himself within this exception by reason of the presence in the bills of lading of the following clause:

" '(8) The liability of the carrier under this bill of lading shall be governed by the law of England, with reference to which this contract is made.'

"We are satisfied, however, from the evidence, *that the contract was fully expressed*

*in the charter party, which contained no such clause, and that there was no intention to modify that contract in so important a particular merely by making use of a printed form of bill of lading which contained the so-called 'flag clause.'*" (Italics our own.)

Eminent text-writers have expressed the same views. Thus Carver, supra, in section 57:

"On the other hand, the bill of lading is not always the expression of the contract; that may have been definitely concluded before it was given, as where the shipper had chartered the vessel or part of her. In such cases the original contract generally determines the relations between the shipper and the shipowner.

"And where the bill of lading is on its face manifestly not a complete statement of the contract, evidence may be given to complete it."

And Pitman, supra, at page 43: "It was held that the charter-party and bill of lading were to be read and construed together, that the conditions 'as per charter party,' etc., referred to the conditions as to payment of freight, one of which was the cesser of liability of the defendants, and that the defendants were not liable, their liability on the charter-party ending on the completion of the loading, no new liability being created by the bill of lading. [English case cited.]" See, also, Scrutton, supra, article 3; Northern Pacific R. Co. v. American Trading Co., 195 U. S. 439, 463, 25 S. Ct. 84, 49 L. Ed. 269; The Ethel, 8 Fed. Cas. 798, 799, 800, No. 4,540; Two Hundred and Sixty Hogsheads of Molasses, 24 Fed. Cas. 445, 446, No. 14,296; The Chadwicke (D. C.) 29 F. 521, 524; Città Di Palermo (D. C.) 153 F. 378, 380; The Arctic Bird (D. C.) 109 F. 167, 172–173; The Mar Mediterraneo (D. C.) 1 F.(2d) 459, 460.

■ According to the doctrine laid down in The Henry B. Hyde (D. C.) 82 F. 681, 683, "the stipulations stamped upon the face of the bills of lading under which the goods of the libelants were shipped are to be treated as parts of such bills of lading, and binding upon the libelants. * *. * *" This case, indeed, is cited by the appellant in its "concession" that such stipulations incorporate the subject-matter to which they refer as a part of the contract.

This being so, they are to be construed as part of the bill of lading itself. And a bill of lading is to be construed strictly against the carrier: "As the exceptions were introduced by the shipowners themselves in their own favor, they are to be construed most strongly against them." The Caledonia, 157 U. S. 124, 137, 15 S. Ct. 537, 543, 39 L. Ed. 644. See also, E. Gerli & Co., Inc., v. Cunard S. S. Co., Ltd. (C. C. A. 2) 48 F.(2d) 115, 116; Baltimore & O. R. Co. v. Doyle (C. C. A. 3) 142 F. 669, 673, in which latter case the court said: "Any reasonable doubt as to the proper interpretation of the contract should be resolved against the railroad company. It chose the language incorporated in the printed portions of the bill of lading."

■ The principle that courts should look to all the attendant circumstances in construing a carrier's contract was emphasized by the late Judge Gilbert of this court in Pacific Coast Co. et al. v. Yukon Independent Transp. Co., 155 F. 29, 34. Referring to the opinion of the District Court, the learned jurist stated:

"The court said:

"'For this reason the courts are compelled, when called upon to enforce them, to construe such contracts fairly, and to reject stipulations which are unreasonable, and to deny carriers all unfair advantages claimed by reason of exemptions from liability for negligence or plain violation of the carrier's obligation. In order to give a fair construction to a contract, all its parts must be considered, and conditions and circumstances which the evidence proves were known to the parties and contemplated by them in making it.'

"This doctrine is well sustained by the authorities, and is applicable to bills of lading, no matter in what kind of type they are printed. In Marx v. National Steamship Co. (D. C.) 22 F. 680, Judge Brown thus expressed the recognized rule of construction:

"'In construing bills of lading, as in construing other commercial instruments, it is the right and duty of the court to look, not only to the language employed, but to the subject-matter and to the surrounding circumstances, in order to determine the proper effect of the language used, by putting itself so far as possible in the place of the contracting parties.'"

Judge Gilbert cited the Yukon Case in support of his opinion in W. R. Grace & Co. v. Frank Waterhouse & Co., Inc. (C. C. A.) 264 F. 422, 424.

■ Without further reciting the evidence, we believe that a study of the record leads to the inevitable conclusion that, as to all matters relating to freight, the oral agreement and the confirmatory letter constituted

the contract between the parties in the instant case. The marginal notations on the bills of lading themselves would so indicate.

For the reasons stated, we see no reason for disturbing the judgment of the lower court.

Judgment affirmed.