**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

OAK HARBOR FREIGHT LINES, INC.,
a Washington corporation,
          *Plaintiff-Appellee,*

v.

SEARS ROEBUCK & Co., dba Sears
Contract Sales, a foreign
corporation,
          *Defendant-cross-claimant-*
                    *Appellant,*

and

NATIONAL LOGISTICS CORPORATION,
a foreign corporation,
          *Defendant-cross-defendant.*

No. 06-35460

D.C. No.
CV-05-00284-TSZ

OPINION

Appeal from the United States District Court
for the Western District of Washington
Thomas S. Zilly, District Judge, Presiding

Argued and Submitted
November 5, 2007—Seattle, Washington

Filed January 18, 2008

Before: William C. Canby, Jr., Susan P. Graber, and
Ronald M. Gould, Circuit Judges.

Opinion by Judge Graber

## COUNSEL

Paula E. Litt and William B. Berndt, Schopf & Weiss LLP, Chicago, Illinois, for the defendant-appellant.

Kenneth W. Hart, Larson Hart & Shepherd PLLC, Seattle, Washington, for the plaintiff-appellee.

**OPINION**

GRABER, Circuit Judge:

Plaintiff Oak Harbor Freight Lines, Inc. ("Oak Harbor"), brought suit against Defendants Sears Roebuck & Co. ("Sears") and National Logistics Corporation ("NLC") to recover nearly half a million dollars for transportation of Sears' freight. NLC arranged the transportation, which Oak Harbor provided. Following cross-motions for summary judgment, the district court held NLC and Sears jointly and severally liable for the charges under Washington law. In a later order, the district court held that Oak Harbor was entitled to both prejudgment and post-judgment interest, with the rate of prejudgment interest set according to Washington law. Sears timely appealed.[1] We now affirm.

## FACTUAL AND PROCEDURAL HISTORY

The district court's opinion recites the facts in detail. *Oak Harbor Freight Lines, Inc. v. Sears Roebuck & Co.*, 420 F. Supp. 2d 1138, 1140-45 (W.D. Wash. 2006). Because the facts are uncontested, we rely on the district court's findings.

Oak Harbor, a Washington corporation and licensed "motor carrier" under the Federal Motor Carrier Safety Act, 49 U.S.C. § 13102(14), provides intrastate and interstate freight transportation. Sears is a New York corporation that, among other things, sells tools and appliances at wholesale and retail. NLC, an Illinois corporation, is a licensed and registered property "broker" that arranges transportation by motor carrier under the authority of the Federal Motor Carrier Safety Act. *Id.* § 13102(2).

NLC provided both brokerage and non-brokerage services for Sears. As a part of its brokerage services, NLC arranged

---

[1]NLC also appealed, but later abandoned its appeal.

for Oak Harbor to move Sears' freight. *See* 49 C.F.R. § 371.2(c) (" 'Brokerage' or 'brokerage service' is the arranging of transportation or the physical movement of a motor vehicle or of property. It can be performed on behalf of a motor carrier, consignor, or consignee."). As a part of its non-brokerage services, NLC reviewed and audited Oak Harbor's freight bills and collected funds from Sears to pay those freight bills. *See id.* § 371.2(d) (" 'Non-brokerage service' is all other service performed by a broker on behalf of a motor carrier, consignor, or consignee.").

Oak Harbor hauled Sears' freight for a number of years without the use of an intermediary. In 1989, Sears hired NLC to perform brokerage services. At first, NLC was hired only to perform brokerage services for "inbound" or "return" shipments, which involved identifying carriers to move freight from Sears' vendors to Sears' warehouses. By early 1992, Sears expanded the scope of NLC's responsibilities to include broker services for "outbound" shipments. The outbound brokerage services required NLC to identify carriers to move Sears' freight from Sears' warehouses to various freight transportation and delivery companies.

On January 8, 1992, Oak Harbor and NLC signed a National Logistics Corporation Carrier Contract ("Carrier Contract") to govern their relationship. The Carrier Contract provided, in pertinent part:

> This AGREEMENT between NATIONAL LOGISTICS CORPORATION (BROKER/ SHIPPER), operating under ICC Broker No. MC205436 and Oak Harbor Freight Lines, Inc. (CARRIER), MC # 139763 engaged in the business of conducting the transportation of regulated commodities in Interstate Commerce over public highways, provides that NATIONAL LOGISTICS CORPORATION will offer a series of shipments to the CARRIER, which the CARRIER agrees to trans-

port. . . . BROKER/SHIPPER and CARRIER agree rates governing shipments will be established to meet the schedules verbally agreed upon and verbal agreement will be reduced to writing by CARRIER submitting its invoice to BROKER/SHIPPER. *SHIP-PER agrees to pay CARRIER within a predetermined time from date of receipt regardless whether or not BROKER/SHIPPER has been paid for movement.* . . . This AGREEMENT shall be effective on the date it is signed and will remain in full force and effect from signing date for twelve (12) months. AGREEMENT shall be automatically extended for successive twelve (12) month terms or until canceled by either party by giving written notice to the other party at least thirty (30) days prior to the date of termination.

(Emphasis added.) In accordance with the terms of the Carrier Contract, Oak Harbor and NLC negotiated the rates governing the shipments on a roughly annual basis. Other than with respect to rates, they never updated or replaced the Carrier Contract.

Bills of lading were used for all of Sears' freight carried by Oak Harbor.[2] For return shipments, Oak Harbor generated the bills of lading ("return bills of lading" or "Oak Harbor-generated bills of lading") using its standard, uniform straight bill of lading form. Oak Harbor designed its bills of lading to comply with industry standards. The return bills of lading designated Sears as the "consignee" and were marked "collect."

---

[2]"The bill of lading is the basic transportation contract between the shipper-consignor and the carrier; its terms and conditions bind the shipper and all connecting carriers." *S. Pac. Transp. Co. v. Commercial Metals Co.*, 456 U.S. 336, 342 (1982) (addressing default liability terms for rail bills of lading); *see also C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 478-79 (9th Cir. 2000) (applying *S. Pac. Transp.* to motor freight bills of lading). A bill of lading also can serve as a receipt for goods and as evidence of title. *C.A.R. Transp.*, 213 F.3d at 479 n.5.

In the "Bill To" section of the return bills of lading, "Third Party Billing" was written.

Sears generated the bills of lading for outbound shipments ("outbound bills of lading" or "Sears-generated bills of lading"). As with the Oak Harbor-generated bills of lading, Sears designed its outbound bills of lading to comply with industry standards. On the bottom of the outbound bills of lading the following text appeared: "This document is tendered as an individual Bill of Lading. All terms and conditions of the straight Bill of Lading and applicable tariff and classifications in effect as of the date hereon apply." The outbound bills of lading read "Freight Terms: PREPAID" and instructed the carrier to send freight bills to NLC. These bills of lading did not identify the "Shipper" or "Consignor," but they did contain entries under the categories "Ship From," "Consign to," and "Carrier." The "Ship From" category identified a Sears warehouse. The "Consign to" category identified the destination of the shipment. The "Carrier" category identified Oak Harbor.

In accordance with the terms of the bills of lading, billing and payment between the parties generally followed this pattern: (1) Oak Harbor sent NLC a billing invoice at least three days after Oak Harbor delivered the freight, and Oak Harbor expected to be paid by NLC within 30 days of the date shown on the invoice; (2) after auditing the invoices, NLC billed Sears weekly for the freight charges that had accumulated since the last billing date; (3) Sears paid NLC about five days after receiving the bill from NLC; and (4) NLC paid Oak Harbor, with the funds received from Sears, about 25 days after NLC received Oak Harbor's billing invoice.

In mid-2004, Oak Harbor learned that Sears would no longer use NLC as its broker as of January 2005. In fact, Sears terminated NLC's services earlier, on November 12, 2004. By the end of November 2004, Oak Harbor was owed more than $400,000 for shipments of Sears' freight. On December 12,

2004, NLC sent Oak Harbor a letter recommending that Oak Harbor seek payment directly from Sears. In response to inquiries by Oak Harbor concerning payment, Sears denied liability and informed Oak Harbor that NLC was responsible for the freight charges. By the time Oak Harbor sought collection from Sears, Sears had paid $227,202.50 to NLC for freight charges invoiced by Oak Harbor.[3]

In early 2005, Oak Harbor sued both NLC and Sears in Washington state court for "monies due." Sears timely removed the proceeding to federal district court pursuant to 28 U.S.C. §§ 1332, 1441, and 1446.

Following cross-motions for summary judgment, the district court held "NLC and Sears jointly and severally liable to Oak Harbor for $426,417.94 in freight charges that were incurred in connection with [the] shipments arranged by NLC." *Oak Harbor*, 420 F. Supp. 2d at 1152. The district court also held that Sears was "entitled to recover in indemnity against NLC any portion of the $227,202.50 that Sears directly pays Oak Harbor." *Id.*

In reaching its holdings, the district court explained that NLC was liable to Oak Harbor under the Carrier Contract. *Id.* at 1146-47. The district court did not premise Sears' liability, however, on the Carrier Contract. Rather, the district court interpreted the bills of lading generated by Sears and Oak Harbor as imposing liability on Sears, which the Carrier Contract did not limit. *Id.* at 1147-50. In an issue of first impression within the Ninth Circuit, the district court followed the Fourth, Fifth, and Eleventh Circuits and adopted a rule that equitable estoppel does not bar Sears' liability for the $227,202.50 already paid to NLC for freight shipments. *Id.* at 1151.

---

[3]Sears initially claimed to have paid about $278,000 of Oak Harbor's freight bills, but later conceded that about $50,000 of that amount represented NLC's service charges and markup on the freight bills.

After the district court entered judgment, Oak Harbor moved for an award of prejudgment and post-judgment interest. The district court held Sears liable for prejudgment interest at the rate set by Washington state law and for post-judgment interest at the rate set by federal law.

Sears timely appealed.

## STANDARDS OF REVIEW

We review de novo a district court's grant of summary judgment. *Universal Health Servs. Inc. v. Thompson*, 363 F.3d 1013, 1019 (9th Cir. 2004). Viewing the evidence in the light most favorable to the nonmoving party, we must determine whether there are genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Id.* When, as here, the facts are not in dispute, the only question is whether the district court correctly applied the law. *Id.*

We review for abuse of discretion an award of prejudgment interest, *Hayes v. Palm Seedlings Partners-A (In re Agric. Research & Tech. Group, Inc.)*, 916 F.2d 528, 533 (9th Cir. 1990), but review de novo whether state or federal law applies to determine the amount and availability of prejudgment interest, *McCalla v. Royal MacCabees Life Ins. Co.*, 369 F.3d 1128, 1129 (9th Cir. 2004).

## DISCUSSION

A.  *The district court correctly held Sears liable for the charges incurred by Oak Harbor in shipping Sears' freight.*

[1] As we have noted, a bill of lading is the basic transportation contract between the shipper/consignor and the carrier, the terms and conditions of which bind the shipper and all connecting carriers. *S. Pac. Transp. Co. v. Commercial Met-*

*als Co.*, 456 U.S. 336, 342 (1982). In the absence of a statement to the contrary, when a bill of lading is intended to conform to the industry standard, by default "the consignor remains primarily liable." *Id.* at 343. In *C.A.R. Transportation Brokerage Co. v. Darden Restaurants, Inc.*, we explained the default terms and conditions of a standard bill of lading:

> The bill of lading provides that the owner or consignee shall pay the freight and all other lawful charges upon the transported property and that the consignor remains liable to the carrier for all lawful charges. The bill of lading, however, also contains "nonrecourse" and "prepaid" provisions that, if marked by the parties, release the consignor and consignee from liability for the freight charges. If the nonrecourse clause is signed by the consignor and no provision is made for the payment of freight, delivery of the shipment to the consignee relieves the consignor of liability. Similarly, when the prepaid provision on the bill of lading has been marked and the consignee has already paid its bill to the consignor, the consignee is not liable to the carrier for payment of the freight charges.

213 F.3d 474, 478-79 (9th Cir. 2000) (citations and footnotes omitted).

**[2]** Those default liability provisions can be modified by contract so as to make "the liability allocation presumptions on the bill of lading . . . unnecessary." *Id.* at 479. For example, if parties enter into a contract before preparing a bill of lading, and there is "an irreconcilable repugnancy between the prior written contract and the bills of lading, that conflict would have to be resolved in favor of the former." *Toyo Kisen Kaisha v. W.R. Grace & Co.*, 53 F.2d 740, 742 (9th Cir. 1931). "It is only where the parties fail to agree or where discriminatory practices are present that the [bill of lading's] default terms bind the parties." *C.A.R. Transp.*, 213 F.3d at

479. In *C.A.R. Transportation*, we held that a carrier had modified the default provisions of certain bills of lading and had waived shipper/consignor liability when its employees signed a document, separate from the bills of lading, stating that the carrier would *not* seek payment from the shipper/consignor. *Id.* at 476-79.

**[3]** Here, the bills of lading used by the parties to ship Sears' freight—both the Sears-generated bills of lading for the outbound shipments and the Oak Harbor-generated bills of lading for the return shipments—were designed to comply with industry standards. Accordingly, they adopted the default terms of the uniform straight bill of lading.[4] Under those default terms, the shipper/consignor is liable for freight charges unless the bill of lading is marked "nonrecourse." *Id.* at 478-79. Sears was the shipper/consignor on the outbound bills of lading. Its bills of lading did not include a "nonrecourse" clause. As a consequence, in the absence of a separate agreement, Sears is liable for the freight charges on the outbound bills of lading.

**[4]** Similarly, under the default terms, a consignee is liable for freight charges unless the bill of lading is marked "prepaid." *Id.* Sears was the consignee on the return bills of lading. Because the bills of lading were marked "collect"—*not* "prepaid"—in the absence of a separate agreement, Sears is liable for the freight charges on the return shipment bills of lading. In sum, in the absence of a separate agreement, Sears

---

[4]The outbound bills of lading provided: "All terms and conditions of the straight Bill of Lading and applicable tariff and classifications in effect as of the date hereon apply," thereby expressly adopting the rules for the Uniform Straight Bill of Lading. *See, e.g.*, American Trucking Associations, Inc., National Motor Freight Classification, STB NMF 100-AD, *Uniform Bill of Lading Terms and Conditions* (2003). Similarly, Oak Harbor acknowledged that the bills of lading for return shipments were based on the industry standards: the Uniform Straight Bill of Lading form. *See id.*

is liable for Oak Harbor's freight charges because of the default liability provisions that are part of the bills of lading.

Although Sears agrees with these general principles, it nevertheless contends that, for three reasons, it should not be required to pay the freight charges. First, Sears argues that the Carrier Contract waives the default liability provisions of the bills of lading. Second, Sears argues that, if not a waiver, the Carrier Contract was the sole lawful contract governing the shipments, thereby rendering the bills of lading mere receipts. Third, even if the Carrier Contract does not modify the default liability provision, Sears argues that Oak Harbor is equitably estopped from collecting the freight charges from Sears. We address each argument in turn.

### 1. *Carrier Contract—Waiver*

**[5]** The parties to a freight shipment generally are free to assign liability for the payment of freight charges through a contract separate from the bill of lading. *Louisville & Nashville R.R. Co. v. Cent. Iron & Coal Co.*, 265 U.S. 59, 66-67 (1924). Such a contract may provide that "the shipper agrees absolutely to pay the charges, or . . . merely that he shall pay if the consignee does not pay . . . , or . . . that only the [consignee] shall be liable for the freight charges, or [that] both the shipper and the consignee may be made liable." *Id.* "It is only where the *parties* fail to agree or where discriminatory practices are present that the [bill of lading] default terms bind the *parties*." *C.A.R. Transp.*, 213 F.3d at 479 (emphases added).

**[6]** Sears contends that the Carrier Contract between Oak Harbor and NLC waived Oak Harbor's recourse against Sears under the otherwise-applicable default liability provisions of the bills of lading. Although it is well established that a contract between the parties to a bill of lading—the *shipper*, the *carrier*, and the *consignee*—can allocate liability for payment of freight charges, there is no support for the proposition that

a contract with a broker, who is *not a party* to the bill of lading, can do the same. *See Louisville*, 265 U.S. at 67 (looking to the promises, if any, made by the *shipper* to determine liability for payment of freight charges); *S. Pac. Transp.*, 456 U.S. at 342 ("The bill of lading is the basic transportation contract between the shipper-consignor and the carrier."); *C.A.R. Transp.*, 213 F.3d at 478-79 ("The bill of lading provides that the owner or consignee shall pay the freight . . . and that the consignor remains liable to the carrier . . . .").

Sears cites no authority to support its proposition that a contract between a carrier and a broker can modify the default liability provisions of a bill of lading. In each of the two cases on which Sears primarily relies, *Toyo Kisen*, 53 F.2d 740, and *Roll Form Products, Inc. v. All State Trucking Co. (In re Roll Form Products, Inc.)*, 662 F.2d 150 (2d Cir. 1981), the contracts at issue were entered into between a carrier and the direct parties to the bill of lading—the shipper, consignor, or consignee. Neither case involved a contract with a broker.

[7] Only Oak Harbor and NLC executed the Carrier Contract. Sears was neither named in, nor a signatory to, that agreement. The Carrier Contract never mentions or refers to Sears by name or description. The Carrier Contract makes no express or implied statements that Sears will not pay Oak Harbor for the shipments, nor does the contract make any express or implied statements that Oak Harbor will not seek payment from Sears. The Carrier Contract merely provides that NLC will be liable for freight charges regardless whether or not NLC is paid.[5] This agreement by NLC to be liable for

---

[5]The Carrier Contract states that "SHIPPER agrees to pay CARRIER within a predetermined time . . . regardless whether or not BROKER/SHIPPER has been paid." The district court found that the term "SHIPPER" means NLC, because Sears "could not have 'agreed' to anything given that it was not a party to, and did not sign, the contract . . . [and] NLC, not Sears, was receiving Oak Harbor's freight bills and was expected to pay them within thirty days." *Oak Harbor*, 420 F. Supp. 2d at 1146. As the district court found, and Sears does not challenge, the Carrier Contract can be understood as follows: "NLC agrees to pay Oak Harbor within a predetermined time . . . regardless whether or not NLC has been paid."

the freight charges does not imply that Sears is not liable. To hold as Sears wishes would permit a shipper to insulate itself from liability for the payment of freight charges by the simple act of using a broker. We hold that the Carrier Contract did not alter Sears' liability for the freight charges under the bills of lading.[6]

### 2. *Carrier Contract—Sole Lawful Contract*

In the alternative, Sears argues that the Carrier Contract was the sole lawful contract for the freight shipments and that the bills of lading were merely receipts. Sears first notes that, in 1992, when Oak Harbor and NLC executed the Carrier Contract, federal law required that Oak Harbor enter into a written agreement to charge below-tariff rates. 49 C.F.R. § 1053.1 (1991) (repealed June 20, 1992). Oak Harbor concedes that it intended the Carrier Contract to comply with that regulation. As a result, Sears reasons, Oak Harbor and NLC intended that the Carrier Contract be the sole legal contract for shipments, thereby foreclosing the possibility that the bills of lading had any effect other than as receipts.

[8] The former regulation that Sears cites did not presume to control all aspects of a carriage agreement. Rather, the regulation provided only that such agreements "shall be in writing, shall provide for transportation for a particular shipper or shippers, shall be bilateral and impose specific obligations upon both carrier and shipper or shippers, [and] shall cover a series of shipments during a stated period of time." *Id.* Critically, the regulation did not require that the agreement be the exclusive contract for the carriage of goods. Consequently,

---

[6]Sears' further argument—that the district court created a "super-waiver" requirement by holding that the Carrier Contract did not constitute an "unequivocal waiver of Oak Harbor's rights to collect freight charges," *Oak Harbor*, 420 F. Supp. 2d at 1149—is equally unavailing on de novo review. The Carrier Contract contains no waivers—express or implied—of the default liability provisions in the bills of lading.

the regulation does not displace the default liability provisions for bills of lading, which we have discussed above.

**[9]** Sears also argues that the bills of lading could not function as contracts, because the Carrier Contract contains the price term for the shipments. In support, Sears cites *Toyo Kisen*, in which we explained that, when there is "irreconcilable repugnancy between the prior written contract and the bills of lading, that conflict would have to be resolved in favor of the former." *Toyo Kisen Kaisha*, 53 F.2d at 742. We found an "irreconcilable repugnancy" in *Toyo Kisen* because the oral and written agreements at issue provided that payment for disputed freight charges would occur only after delivery of the goods to Hawaii, while the bill of lading provided that payment for the freight charges would occur whether or not the goods were delivered. *Id.* at 741.

**[10]** There is no such irreconcilable repugnancy between the Carrier Contract and the bills of lading in this case. They operate concurrently and in harmony to provide the key terms for Sears' freight shipments. The bills of lading contain no price terms, while the Carrier Contract determines the price for the shipments. The Carrier Contract does not address Sears' liability for payment of freight charges, while the default provisions in the bills of lading make Sears liable. The bills of lading identify the shipper, consignor, and consignee; describe where the goods are to be picked up and where they are to be delivered; and contain the payment liability terms of "prepaid" or "collect" to the bills of lading, none of which the Carrier Contract provides.

**[11]** In summary, the regulations under which Oak Harbor and NLC entered into the Carrier Contract did not require that the Carrier Contract constitute the *sole* agreement for the shipment of freight. In addition, the terms of the Carrier Contract and the terms of the bills of lading work in harmony to supply different aspects of the parties' relationship; we can give effect to both the Carrier Contract and the bills of lading

as concurrent contracts for the carriage of Sears' freight. Accordingly, we hold that the Carrier Contract did not constitute the sole legal agreement for the carriage of Sears' freight.

### 3. *Equitable Estoppel*

[12] Sears further argues that it "paid NLC for the majority of the freight charges at issue" and that, as "an innocent party," it "should not be required to pay twice."[7] In other words, Sears contends that equitable estoppel should bar Oak Harbor's collection of the freight charges from it. Whether the shipper or the carrier bears the risk if a freight forwarder, broker, or consolidator fails to forward a freight payment, or if a consignee fails to forward a freight payment, is a question of first impression for this circuit.

In support of its position, Sears relies primarily on the Sixth Circuit's decision in *Olson Distributing Systems, Inc. v. Glasurit America, Inc.*, 850 F.2d 295 (6th Cir. 1988). In that case, a motor carrier sought payment from a shipper for freight bills that the carrier had submitted to a freight forwarder. *Id.* at 295. The shipper paid the freight forwarder, but the freight forwarder absconded with the money and never paid the carrier. *Id.* Although the bills of lading were marked "prepaid," and the shipper did not sign the "nonrecourse" clause on the bills of lading, the Sixth Circuit held that the risk of loss should rest with the carrier. *Id.* at 295-96.

The Sixth Circuit pointed to four critical facts in reaching its holding. First, the carrier provided the shipper with freight bills stating that the freight charges were to be paid to the freight forwarder, not the carrier. *Id.* at 297. In other words,

---

[7]Sears' argument ignores that it paid only $227,202.50 of the $426,417.94 in charges incurred by Oak Harbor in shipping Sears' freight. Nearly $200,000 in freight charges never has been paid by Sears to NLC or Oak Harbor, even though Sears received the full benefit of both of their services.

the carrier's own bills indicated that the carrier should not expect payment from the shipper. *Id.* Second, the carrier did not diligently bill the freight forwarder for shipments, waiting until "two to three months after the last delivery" before sending *any* freight bills to the freight forwarder. *Id.* at 295. Third, the carrier violated then-current credit regulations established by the Interstate Commerce Commission which, had the carrier followed, would have allowed the carrier to identify that the freight forwarder was absconding with the money. *Id.* at 297. Finally, had the carrier notified the shipper sooner, the carrier could have limited its losses. *Id.* The court concluded: "Here[,] the doctrine of equitable estoppel requires that the loss fall on the carrier because its actions had the effect of lulling the shipper into believing that it was expecting and receiving payment from the freight forwarder." *Id.* at 296.

[13] We agree with the district court that *Olson* is an "outlier," the extreme facts of which bear little resemblance to what happened here.[8] *Oak Harbor*, 420 F. Supp. 2d at 1151. Three of our sister circuits—the Fourth, Fifth, and Eleventh Circuits—have reached a conclusion at odds with *Olson* on facts much closer to those before us. Those courts have held that a shipper should bear the risk when it chooses to pay for freight charges through a broker rather than directly to the carrier. *Hawkspere Shipping Co. v. Intamex, S.A.*, 330 F.3d 225, 237-38 (4th Cir. 2003); *Strachan Shipping Co. v. Dresser Indus., Inc.*, 701 F.2d 483, 489-90 (5th Cir. 1983); *Nat'l Shipping Co. of Saudi Arabia v. Omni Lines, Inc.*, 106

---

[8]Citing out-of-circuit authority, Sears takes exception to the "outlier" characterization. That authority is not availing. In two of the cited cases, the courts held that equitable estoppel is available when an *innocent consignee* paid a shipper/consignor and received a bill of lading from the carrier marked "prepaid." *See EF Operating Corp. v. Am. Bldgs.*, 993 F.2d 1046, 1052 (3d Cir. 1993); *Consol. Freightways Corp. v. Admiral Corp.*, 442 F.2d 56, 59-60 (7th Cir. 1971). The third cited case is even further from the point, because it addressed a misapplication of mandatory tariff rates where no double payment had occurred. *Inman Freight Sys., Inc. v. Olin Corp.*, 807 F.2d 117, 121 (8th Cir. 1986).

F.3d 1544, 1546-47 (11th Cir. 1997). As noted by the district court, *Oak Harbor*, 420 F. Supp. 2d at 1151, the policy reasons for this result are persuasive. The Fifth Circuit wrote:

> [W]e think that our result comports with economic reality. A freight forwarder provides a service. He sells his expertise and experience in booking and preparing cargo for shipment. He depends upon the fees paid by both shipper and carrier. He has few assets, and he books amounts of cargo far exceeding his net worth. Carriers must expect payment will come from the shipper, although it may pass through the forwarder's hands. While the carrier may extend credit to the forwarder, there is no economically rational motive for the carrier to release the shipper. The more parties that are liable, the greater the assurance for the carrier that he will be paid.

*Strachan*, 701 F.2d at 490. Furthermore, as those courts have explained, the shipper, and not the carrier, is in the best position to avoid liability for double payment by dealing with a reputable freight forwarder, by contracting with the carrier to eliminate the shipper's liability, or by simply paying the carrier directly. *See Nat'l Shipping*, 106 F.3d at 1547 (recommending using reputable freight forwarders or contracting to eliminate liability); *Hawkspere*, 330 F.3d at 237 (recommending paying the carrier directly).

Sears contends that *Southern Pacific Transportation* supports its position. In *Southern Pacific Transportation*, the Court stated that "double payment cases constitute their own category and stand against the placement of duplication of liability upon an innocent party." 456 U.S. at 351. Sears' reliance is misplaced. In *Southern Pacific Transportation*, the Court refused to grant an estoppel defense to a shipper/consignor because, among other reasons, (a) the shipper/consignor was paid for the goods but the carrier was not paid for its services; and (b) the shipper/consignor, having failed

to mark the bill of lading as "nonrecourse," remained primarily liable for the freight charges. 456 U.S. at 351-52. The Court acknowledged that some cases applied equitable estoppel to bar recovery of freight charges by a carrier. *Id*. at 351. But the Court noted that those cases applied estoppel only in limited circumstances: "Each and all of them involved a carrier's misrepresentation, such as a false assertion of prepayment on the bill of lading, upon which a consignee detrimentally relied only to find itself later sued by the carrier for the same freight charges." *Id*. Carriers involved in misrepresentation "constitute their own category and stand against the placement of duplication of liability upon an innocent party." *Id*.

With respect to the outbound shipments as to which Sears was shipper/consignor, we agree with the district court that the *Hawkspere*, *Strachan*, and *National Shipping* line of authority best applies to the facts of this case. Sears generated the bills of lading and failed to protect itself with a "nonrecourse" designation. In addition, Sears selected NLC and directed Oak Harbor to submit its bills through NLC.

With respect to the return shipments, Sears was not an "innocent consignee." The bills of lading clearly were marked "collect," which put Sears on notice that payment was due.[9] In addition, Sears undertook no actions to limits its liability. In particular, Sears could have elected to pay Oak Harbor directly, but did not, and thereby assumed the risk that NLC would fail to forward payment. Furthermore, unlike in *Olson*, Oak Harbor did not extend credit to NLC in violation of federal regulations, and it immediately sought payment from Sears when NLC abrogated its responsibility to forward Sears' freight payments.

[14] Thus, we hold that equitable estoppel does not bar Oak

---

[9]Had the bills of lading been marked "prepaid," Sears could have argued that it relied detrimentally on a representation by Oak Harbor. But they were not so marked.

Harbor's recovery of freight charges from Sears, notwithstanding Sears' payment of a portion of those freight charges to NLC.

B.  *The district court correctly awarded prejudgment interest to Oak Harbor under Washington law.*

On motion by Oak Harbor, the district court awarded prejudgment interest beginning December 15, 2004, at the rate specified by Washington state law. Sears challenges the district court's award of prejudgment interest on two grounds. First, Sears contends that prejudgment interest was improper because Oak Harbor failed to present evidence of the date on which Sears' payments to Oak Harbor were due. Second, Sears contends that, assuming an award of prejudgment interest was proper, the court should apply the federal rate established by 28 U.S.C. § 1961, because the judgment against Sears was premised on federal law.

1.  *Award of Prejudgment Interest*

The district court calculated prejudgment interest using a single "due" date of December 14, 2004, for all 3,386 shipments made by Sears during the approximately four-month period at issue. Oak Harbor proposed that date in its motion for prejudgment interest, as follows:

> Each of the freight charges at issue here was billed at a different date during a time span of about 3-1/2 months, beginning in August and ending in November 2004. Therefore, Oak Harbor would be entitled to prejudgment interest on each such invoice running from the separate date that each became due and payable. However, because there were so many invoices and each was for a relatively small amount, for the sake of simplicity, Oak Harbor will assume for the purposes of this motion that: (1) all 3,386 shipments occurred on the same day; (2) that they

were all then billed in due course on the same day; and, (3) therefore, became due and payable on the same day.

For the purposes of this motion, therefore, Oak Harbor will assume that all 3,386 shipments occurred on November 11, 2004. This was the day before Sears terminated NLC and instructed Oak Harbor to begin as of November 12 to send its freight bills to Menlo Logistics for processing and payment. Consequently, it is [the] last shipment date for which freight invoices would have gone to NLC for payment. It will further be assumed, therefore, that in the normal course of business, by 3 days later on November 14, 2004, NLC had received all 3,386 freight bills from Oak Harbor, for which payment was then due no later than 30 day[s] later on December 14, 2004.

Sears contends that the district court's grant of prejudgment interest was improper because the court held Sears liable for the cost of the shipments under the bills of lading, and those bills of lading did not specify a date on which payments to Oak Harbor were due. But, the assumptions that the district court adopted for purposes of the motion (the ordinary course of billing between the parties and the date of termination of NLC) were consistent with the undisputed evidence in the case. The district court found that, in the ordinary course of their business dealings, NLC billed Sears weekly for the freight shipments, and Sears paid NLC approximately five days after receiving a bill. *Oak Harbor*, 420 F. Supp. 2d at 1144-45. As noted above, Sears terminated NLC's services on November 12, 2004. Applying those assumptions, Sears would have paid NLC well before December 14, 2004.

[15] The only authority that Sears cites to argue against the award of the prejudgment interest actually *supports* the proposition that a district court can use certain shortcuts to achieve

a "fair figure for the interest" to avoid numerous calculations. *See Chandler v. Bombardier Capital, Inc.*, 44 F.3d 80, 84 (2d Cir. 1994) (holding that the district court did not abuse its discretion in applying, over a longer period of time, a much lower interest rate than it otherwise might have applied because the interest was fair and the court avoided "establishing a separate interest figure for each lost monthly payment"). We agree with the Second Circuit's practical approach. Consequently, we hold that the district court did not abuse its discretion in adopting December 14, 2004, as the date from which prejudgment interest should accrue.

2. *Application of Washington Law to Prejudgment Interest*

"Prejudgment interest is a substantive aspect of a plaintiff's claim, rather than a merely procedural mechanism." *Sea Hawk Seafoods, Inc. v. Exxon Corp. (In re the Exxon Valdez)*, 484 F.3d 1098, 1101 (9th Cir. 2007). State law generally governs awards of prejudgment interest in diversity actions, but federal law may apply to the calculation of prejudgment interest when a substantive claim derives from federal law alone. *See id.* at 1100-02 ("In cases tried under admiralty principles *only*, principles of federal law govern a plaintiff's entitlement to prejudgment interest even though the plaintiff may have invoked diversity jurisdiction . . . ." (internal quotation marks omitted)).

**[16]** Sears argues that, because the district court relied on federal law for its decision, federal law should apply to the award of prejudgment interest if one is to be made.[10] That argument ignores the fact that the action was brought, and judgment was entered, on a *state law claim* for "monies due." *Oak Harbor*, 420 F. Supp. 2d at 1146. That the district court cited federal precedents in reasoning to its holding does not

---

[10]Sears' only appellate challenge to the rate of prejudgment interest is the application of state, rather than federal, law.

convert the case into one premised on federal substantive law. We hold that the district court did not err in applying Washington state law to the award of prejudgment interest.

AFFIRMED.