NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

---

COYOTE LOGISTICS, LLC, *Plaintiff/Appellant*,

*v.*

ICON OWNER POOL 1 WEST AND SOUTHWEST, LLC, et al.,
*Defendants/Appellees.*

No. 1 CA-CV 21-0638, 1 CA-CV 21-0764, 1 CA-CV 21-0771 (Consolidated)
FILED 11-3-2022

---

Appeal from the Superior Court in Maricopa County
No. CV2019-006924
The Honorable Joseph P. Mikitish, Judge

**AFFIRMED**

---

COUNSEL

Koeller Nebeker Carlson & Haluck LLP, Phoenix
By David W. Kash
*Co-Counsel for Plaintiff/Appellant*

Mitchell-Handschuh Law Group, Atlanta, Georgia
By Jeremy R. Handschuh
*Co-Counsel for Plaintiff/Appellant*

DLA Piper US, LLP, Phoenix
By Craig M. Waugh, Madeline A. Cordray
*Counsel for Defendant/Appellee Icon*

Udall Law Firm, LLP, Phoenix
By Thomas P. Burke, II, Bret S. Shaw
*Counsel for Defendant/Appellee TransChem*

Snell & Wilmer, LLP, Phoenix
By Andrew M. Jacobs, Cory L. Braddock, Patrick A. Tighe
*Counsel for Defendant/Appellee U.S. Ecology*

---

**MEMORANDUM DECISION**

Presiding Judge Jennifer M. Perkins delivered the decision of the Court, in which Judge James B. Morse Jr. and Judge Michael J. Brown joined.

---

**P E R K I N S**, Judge:

¶1 Coyote Logistics, LLC ("Coyote") appeals the superior court's grant of summary judgments in favor of Icon Owner Pool 1 West/Southwest, LLC ("Icon"), TransChem Environmental, LLC ("TransChem"), and US Ecology Nevada, Inc. ("US Ecology") (collectively, "Appellees"). For the following reasons, we affirm.

### FACTS AND PROCEDURAL BACKGROUND

¶2 Icon owns a commercial property in Phoenix, where its prior tenant left behind over 20,000 tons of leaded cathode ray tube glass ("CRT glass"). TransChem is an Arizona-based waste management company that specializes in handling and transporting hazardous materials. In November 2017, Icon hired TransChem to facilitate the transportation of the abandoned CRT glass from Icon's property to a disposal site owned by US Ecology in Beatty, Nevada.

¶3 Icon and TransChem formed a "Services Agreement," making TransChem responsible for the waste transport. Most importantly, TransChem was responsible for coordinating all necessary trucking and labor. The project was to proceed in two phases. Phase one—the period relevant to this case—required the use of approximately 1,200 loaded trucks. Due to the massive size of the project, Icon allowed TransChem to "utilize certain subcontractors, vendors, agents, or invitees . . . to perform

some or all of the Services." Icon agreed to pay TransChem a flat fee per truckload of transported waste.

¶4        Icon contracted separately with US Ecology to treat and dispose of the waste. Under this agreement, entitled "Waste Transportation, Disposal and Recycling Agreement" ("Disposal Agreement"), Icon retained TransChem to package, transport, and deliver the hazardous waste to US Ecology for neutralization and disposal.

¶5        TransChem outsourced some of the work to nonparty Wholesale Distribution Services, Inc. d/b/a Quality Services ("Wholesale"). Wholesale claimed to be a registered carrier that could provide trucks and drivers to aid the project. Unbeknownst to TransChem, Wholesale did not supply its own trucks and drivers. Instead, Wholesale contracted with other motor carriers and brokers to meet its obligations under the TransChem-US Ecology delivery schedule.

¶6        Wholesale entered into a Credit Agreement with Coyote—a federally licensed property broker that arranges motor carrier transportation of shipments across state lines. Under the Credit Agreement, Coyote arranged for carriers to provide transportation of the waste. From approximately February 2018 to March 2018, Coyote facilitated the transport of 257 shipments on Wholesale's behalf, but Wholesale failed to pay what was owed for those shipments.

¶7        On appeal, the parties disagree about the characterization of the tracking forms used during pickup and delivery. Coyote argues that upon arrival in Phoenix, prepared bills of lading were presented to and issued by the motor carriers. Appellees argue these forms were merely load/unload forms Wholesale created to track the shipments. According to Appellees, Wholesale never provided copies of its "internal tracking documents" to Icon or US Ecology, and neither Icon nor US Ecology authorized its representatives to sign these forms. TransChem used forms entitled "Hazardous Waste Manifests" ("Manifests") throughout the course of the project, as required under federal law, and included Wholesale's federal Environmental Protection Agency ("EPA") identification number. *See* 40 C.F.R. §§ 262.20, 262.21.

¶8        Concerning the 257 shipments at the center of this dispute, Coyote paid each motor carrier it hired and invoiced Wholesale for the entire amount, including fees for brokering the transportation. The invoice totaled $319,650. TransChem paid Wholesale in full, but Wholesale failed to pay Coyote the invoiced amount. In June 2018, Coyote sued Wholesale

in Georgia state court for breach of the Credit Agreement. The court entered a default judgment for Coyote in the amount of $319,650. But Wholesale became insolvent, and Coyote recovered only $27,000 of the judgment.

¶9 In April 2019, Coyote sued Appellees in the Maricopa County Superior Court for the entire $319,650. Coyote filed an Amended Complaint in January 2020, asserting three primary claims: Count I against Icon and US Ecology for joint and several liability based on federal and state law theories; Count II against TransChem, Icon, and US Ecology for quantum meruit and unjust enrichment; and Count III against TransChem for "illegal double-brokering" under 49 U.S.C. §§ 14916 and 13904. Icon moved to dismiss Count I of the Amended Complaint. Coyote filed a Second Amended Complaint in May 2020, asserting the same three claims and adding Icon to Count III for alleged authorization of TransChem's unlicensed brokering. In August 2020, the superior court dismissed Count I, finding the statutory and common law Coyote relied on did not support a cause of action.

¶10 Appellees thereafter sought summary judgment. In January 2021, the court granted US Ecology's motion for judgment on the pleadings as to Count I (joint and several liability), finding "the same analysis it used in its prior rulings on Count I apply to the allegations against US Ecology." As to Count II (unjust enrichment), the court found that none of the Appellees had been unjustly enriched and granted summary judgment in favor of Icon, TransChem, and US Ecology. The court also granted summary judgment in favor of TransChem and Icon as to Count III (illegal brokering) after finding that TransChem is not a "broker" and thus not liable under 49 U.S.C. § 14916 for failure to register as a broker. The court ruled that Icon likewise was not liable under § 14916 for hiring TransChem. The court also awarded attorneys' fees and costs to Appellees in three separate judgments. Coyote timely appealed and we have jurisdiction under A.R.S. § 12-2101(A).

**DISCUSSION**

¶11 We review *de novo* the superior court's grant of summary judgment. *Jackson v. Eagle KMC LLC*, 245 Ariz. 544, 545, ¶ 7 (2019). We will affirm summary judgment if it is correct "for any reason supported by the record, even if not explicitly considered by the superior court." *CK Fam. Irrevocable Tr. No. 1 v. My Home Grp. Real Est. LLC*, 249 Ariz. 506, 508, ¶ 6 (App. 2020).

## I. Count I: There is no contractual relationship between Coyote and Appellees

¶12        In Count I of its Amended Complaint and Second Amended Complaint, Coyote alleged that Icon and US Ecology are jointly liable under various federal and state statutory and common law theories, "and/or prevailing custom." The theories Coyote pursues in Count I depend on its contention that the load/unload forms and Manifests presented to the motor carriers upon arrival in Phoenix are bills of lading, and that these bills of lading make Appellees liable for payment.

¶13        The load/unload forms noted each shipment's origin and destination, the number of packages, the material as CRT glass, and each shipment's weight. Each form also listed the motor carriers that transported the shipment, Icon as the shipper, and US Ecology as the receiver. The Manifests include tracking information and Wholesale's EPA identification number. TransChem testified it regularly uses Manifests to comply with 40 C.F.R. §§ 262.20, 262.21 when shipping hazardous waste.

¶14        The superior court did not find that the documents were bills of lading or internal tracking documents. And it is not necessary for us to determine the correct characterization of these documents. Rather, we look to whether the documents bound Appellees to Coyote in contract. Coyote contends that a bill of lading is "the basic transportation contract between the shipper-consignor and the carrier" and binds the shipper and "all connecting carriers." *S. Pac. Transp. Co. v. Com. Metals Co.*, 456 U.S. 336, 342 (1982); *Arizona Feeds v. S. Pac. Transp. Co.*, 21 Ariz. App. 346, 352–53 (App. 1974).

¶15        A bill of lading can serve as both a receipt and a contract of carriage. *See Schneider Nat. Carriers, Inc. v. Rudolph Exp. Co.*, 855 F. Supp. 270, 273–74 (E.D. Wis. 1994) (citations omitted). But a bill of lading only creates an enforceable contract between the shipper and carrier when the parties so intend. *Id.* at 274 (finding the omission of contractual terms outlining parties' obligations and agreements "suggests that these bills were not intended to function as contract of carriage, and that therefore they were not intended to convey liability for payment of freight charges"); *see also Buckholtz v. Buckholtz*, 246 Ariz. 126, 129, ¶ 10 (App. 2019) ("For an enforceable contract to exist, there must be an offer, acceptance, consideration, a sufficiently specific statement of the parties' obligations, and mutual assent.") (citations omitted).

**¶16**        To support its joint liability theories regarding the purported bills of lading, Coyote relies primarily on the Ninth Circuit's decision in *Oak Harbor Freight Lines, Inc. v. Sears Roebuck, & Co.*, 513 F.3d 949 (9th Cir. 2008). There, the court held that although the broker agreed to be liable for the shipper's freight charges, the broker-carrier agreement did not absolve the shipper of liability to the unpaid carrier because the default terms and conditions of a standard bill of lading hold the consignor primarily liable. *Id.* at 954–55. Coyote argues that separate contracts between shippers and intermediaries do not operate to modify the default freight charge liability rules.

**¶17**        Like Icon, the shipper in *Oak Harbor* denied liability to the carrier because the shipper had paid the intermediary broker, and it was the broker who failed to pay the carrier. *Id.* at 953. But the shipper in *Oak Harbor* generated the bill of lading on which the carrier sought to recover. *Id*. Icon created no such agreement with Coyote or the motor carriers in this case. Likewise, US Ecology cannot be held liable for Wholesale's failure to pay on a theory of secondary liability. Representatives from Icon and US Ecology testified that Wholesale did not provide copies of the load/unload forms for Appellees' records. There was no agreement between Icon and Coyote, or US Ecology and Coyote. Coyote's arguments that default rules of freight charge liability apply to the shipper and receiver, regardless of any separate contracts between Appellees, are meritless when the Icon as the shipper and US Ecology as the receiver did not know of or create any written agreement with Coyote.

**¶18**        As to TransChem, the record shows the shipping documents it used throughout the project do not contain any contractual terms. *See Hill-Shafer P'ship v. Chilson Fam. Tr.*, 165 Ariz. 469, 473 (1990) ("[B]efore a binding contract is formed, the parties must mutually consent to all material terms. A distinct intent common to both parties must exist without doubt or difference, and until all understand alike there can be no assent."). Representatives from TransChem and Wholesale testified that they did not use "bills of lading." Most importantly, Wholesale's representative testified that the forms it created functioned as "internal documents" to track truckloads and pickup/delivery times. And the Manifests—which are government-created forms used by the EPA for tracking hazardous waste across state lines—contain no contractual terms or conditions. *See* 49 C.F.R. 172.205(a). There were no contractual terms making TransChem liable to Coyote for nonpayment by Wholesale.

**¶19**        Icon formed a Services Agreement with TransChem and a Disposal Agreement with US Ecology. TransChem then subcontracted with

Wholesale. These are the only contracts to which Appellees assented. We are not persuaded by Coyote's arguments that Wholesale's load/unload forms or the Manifests constitute bills of lading as enforceable contracts. The record contains no evidence showing Coyote and Appellees agreed to be bound in contract, or that Appellees intended to be contractually liable to Coyote in the event of nonpayment. Because no contractual relationship exists between Coyote and Appellees, Appellees have no legal obligation to pay Coyote for its outstanding invoice. The superior court did not err by entering judgment against Coyote on Count I.

## II. Count II: Appellees were not unjustly enriched, and Coyote was not impoverished by Appellees' conduct

¶20 Coyote asserts state law unjust enrichment and quantum meruit claims. As an initial matter, Coyote argues that federal courts have declined to recognize a "double-payment defense" to freight charge collection cases, relying primarily on the Ninth Circuit's decision in *Oak Harbor Freight Lines, Inc.*, 513 F.3d at 960 (holding that "equitable estoppel does not bar [plaintiff's] recovery of freight charges from [shipper], notwithstanding [shipper's] payment of a portion of those freight charges to [broker]"). But the interstate freight hauling context does not transform Coyote's state law claims into claims for freight charge collection under federal law. Because Coyote asserts state law unjust enrichment claims, we look to Arizona law.

¶21 In *A M Leasing Ltd. v. Baker*, we explained that unjust enrichment cases arise in one of two scenarios: "one in which the defendant paid no one for the benefits received; the other in which the defendant paid in full, but paid someone to whom he was contractually liable for payment rather than the plaintiff, who actually provided the materials or services." 163 Ariz. 194, 198 (App. 1989) (citing *Flooring Systems, Inc. v. Radisson Group, Inc.*, 160 Ariz. 224 (1989)). We held the plaintiff prevails only in the first scenario. *Id.*

¶22 This case is of the second scenario. Icon paid TransChem, pursuant to its Services Agreement, and TransChem paid Wholesale, pursuant to its referral agreement. But Wholesale failed to pay Coyote. Coyote cannot recover from Icon, TransChem, or US Ecology for Wholesale's failure to pay. Appellees have not been unjustly enriched; they properly made payments under their contracts.

¶23 Our holding in *Stratton v. Inspiration Consol. Copper Co.* demonstrates the court's general approach to the second unjust enrichment

scenario. 140 Ariz. 528 (App. 1984). In *Stratton*, defendant property owner hired a general contractor for home construction work, and the general contractor subcontracted painting tasks to plaintiff. *Id.* at 529. The owner paid the general contractor, but the general contractor failed to pay plaintiff, whose suit against the owner included a claim for unjust enrichment. *Id.*

¶24        No contract existed between the owner and the plaintiff—only between the owner and contractor, and the contractor and plaintiff. *Id.* at 530. In that case, we held plaintiff could not recover against the owner. *Id.* at 531 ("[T]he doctrine of unjust enrichment has no application to the owner where an explicit contract exists between the [plaintiff] and the prime contractor.") (citing *Advance Leasing and Crane v. Del E. Webb Corp.*, 117 Ariz. 451, 454 (App. 1977)).

¶25        Given Coyote lacks contractual privity with any of the Appellees, *see* ¶ 19 *supra*, unjust enrichment does not apply. *See Stratton*, 140 Ariz. at 530–31. Coyote's unjust enrichment claims fail as a matter of law.

¶26        Even if Coyote had a contract with Appellees, Coyote could only recover under a theory of unjust enrichment if it established: (1) Appellees were enriched by receiving a benefit; (2) Coyote is impoverished as a result of Appellees' enrichment; (3) a connection exists between Appellees' enrichment and Coyote's impoverishment; (4) the enrichment and impoverishment were unjustified; and (5) there is no other remedy provided by law. *Freeman v. Sorchych*, 226 Ariz. 242, 251, ¶ 27 (App. 2011). Coyote fails to establish these elements.

¶27        The record supports the superior court's finding that TransChem received payment from Icon, and TransChem paid Wholesale for the transportation services it provided. Icon did not withhold payments to TransChem, and TransChem did not withhold payments for the work referred to Wholesale. Any impoverishment suffered by Coyote is not connected to Appellees' conduct, but rather to Wholesale's failure to pay. Appellees were not enriched, and Coyote was not impoverished as a result of Appellees' enrichment. *See Columbia Group, Inc. v. Homeowners Ass'n of Finisterra, Inc.*, 151 Ariz. 299, 302 (App. 1986) (denying subcontractor's claim against owners for unjust enrichment on the basis that "the evidence fails to show any benefit they received for which they did not pay"). The superior court did not err by granting judgment against Coyote on Count II.

### III. Count III: TransChem is not a broker, as defined by 49 U.S.C. §§ 13902, 13904, 14916, and 49 C.F.R. § 371.2(a)

¶28 It is undisputed that TransChem is a registered motor carrier. Under 49 U.S.C. § 13102(14), a motor carrier is "a person providing motor vehicle transportation for compensation." And a broker is "a person, other than a motor carrier or an employee or agent of a motor carrier, that as a principal or agent sells, offers for sale, negotiates for, or holds itself out by solicitation, advertisement, or otherwise as selling, providing, or arranging for, transportation by motor carrier for compensation." 49 U.S.C. § 13102(2). An interstate broker must satisfy certain registration requirements. 49 U.S.C. § 14916(a) (referencing 49 U.S.C. § 13904).

¶29 Coyote alleges that when TransChem subcontracted with Wholesale, it violated 49 U.S.C. §§ 13902 and 14916 for engaging in interstate broker services without a federal broker's license. *See* 49 U.S.C. §§ 13902 ("motor carrier may not broker transportation services unless the motor carrier has registered as a broker"), 14916 ("a person may provide interstate brokerage services as a broker only if that person . . . is registered under, and in compliance with, section 13902"). Coyote alleges Icon is likewise liable for knowingly authorizing TransChem to "broker" the shipments without a license.

¶30 The federal statute for broker registration specifically excludes carriers who subcontract with other carriers: "This subsection does not apply to a motor carrier registered under this chapter or to an employee or agent of the motor carrier to the extent the transportation is to be provided entirely by the motor carrier, with other registered motor carriers, or with rail or water carriers." 49 U.S.C. § 13904(d)(2). And federal regulation § 371.2(a) further clarifies that motor carriers "are not brokers within the meaning of [§ 371.2(a)] when they *arrange or offer to arrange the transportation of shipments which they are authorized to transport and which they have accepted and legally bound themselves to transport*." 49 C.F.R. § 371.2(a) (emphasis added).

¶31 Consistent with the regulation's broker-motor carrier distinction, federal courts hold that a party accepting legal responsibility for transport is a motor carrier under the statute. *See, e.g., Essex Ins. Co. v. Barrett Moving & Storage, Inc.*, 885 F.3d 1292, 1301 (11th Cir. 2018) ("[T]he key distinction is whether the disputed party accepted *legal* responsibility to transport the shipment."); *Ascaro, LLC v. England Logistics, Inc.*, 71 F. Supp. 3d 990, 995 (D. Ariz. 2014) ("If a party accepted responsibility for ensuring delivery of the goods, regardless of who actually transported

them, then the party qualifies as a carrier.") (cleaned up). To determine whether a party accepted legal responsibility for the shipment, the court may ask: "pursuant to the parties' agreement, with whom did the shipper entrust the cargo?" *Essex Ins. Co.*, 885 F.3d at 1302.

¶32        The undisputed facts show the Icon-TransChem Services Agreement imposes the legal obligation upon TransChem to safely transport the waste—an obligation that TransChem accepted. The agreement identified TransChem as the responsible party for managing the shipments from Phoenix to Beatty: "Contractor [TransChem] will be responsible for, among other things, handling all logistics for . . . (ii) transporting the Abandoned Materials . . . to the identified waste disposal facility . . . (iii) ensuring the delivery of all such Abandoned Materials to the Disposal Facility in accordance with Applicable Laws . . . ."

¶33        TransChem carried some of the shipments itself, directly subcontracted with other transporters to aid the project, and was "solely and wholly responsible for any Subcontractor that it engage[d] in connection with this Agreement." Icon clearly entrusted all aspects of the transport with TransChem. *See Essex Ins. Co.*, 885 F.3d at 1302. Subcontracting was explicitly permitted via the Services Agreement, and the federal regulation specifically allows TransChem—as a registered motor carrier—to "arrange the transportation of shipments" if it is authorized to do so and accepted legal responsibility for the shipments. *See* 49 C.F.R. § 371.2(a).

¶34        TransChem's subcontract with Wholesale did not equate to brokering, and thus TransChem did not engage in unlicensed brokering activities. For the same reasons, Icon did not violate the statute and Coyote is not an injured party under 42 U.S.C. § 14916(c)(2). The superior court did not err by granting judgment against Coyote on Count III.

### IV. Attorneys' Fees

¶35        Coyote asks us to vacate the awards for Appellees' attorneys' fees but offers no supporting argument other than its general request to vacate each of the three judgments. We review the superior court's award for an abuse of discretion. *See Skydive Arizona, Inc. v. Hogue*, 238 Ariz. 357, 369, ¶ 50 (App. 2015). Coyote has not identified any abuse of discretion in the fee awards, and we therefore affirm the awards.

¶36        Pursuant to A.R.S. § 12-341 and A.R.S. § 12-341.01, Appellees request attorneys' fees and costs incurred in litigating this appeal. In our discretion, we award Icon, TransChem, and US Ecology their reasonable

attorneys' fees and taxable costs on appeal, contingent upon compliance with ARCAP 21. We deny Coyote's request.

**CONCLUSION**

¶37        We affirm.



AMY M. WOOD • Clerk of the Court
FILED:        AA